UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DANTE D. MAJOR,

                              Petitioner,

                                                      9:18-cv-0418
v.                                                       (DNH/TWD)

JAMIE LAMANNA,

                             Respondent.
_____

APPEARANCES:                           OF COUNSEL:

DANTE D. MAJOR
Petitioner, *pro se*
13-B-0181
Green Haven Correctional Facility
P.O. Box 4000
Stormville, NY 12582

HON. LETITIA JAMES                    MARGARET A. CIEPRISZ, ESQ.
Attorney General of the State of New York    Ass't Attorney General
Attorney for Respondent
28 Liberty Street
New York, NY 10005

**THÉRÈSE WILEY DANCKS, United States Magistrate Judge**

**<u>REPORT-RECOMMENDATION AND ORDER</u>**

      This matter has been referred for a Report and Recommendation by the Hon. David N.

Hurd, United States District Judge, pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule

72.3(c).  Presently before this Court is the second amended petition of *pro se* Petitioner Dante D.

Major, seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2255.  (Dkt. No. 35.)

Respondent opposes the petition.  (Dkt. Nos. 62, 63.)  The state court record was filed under

separate cover.  (Dkt. No. 64.)  Petitioner filed a reply.  (Dkt. No. 69.)  For the reasons that

follow, the Court recommends that the petition be denied and dismissed.

## I.    BACKGROUND

Respondent has included a detailed description of the facts and procedural history of this

case.  (Dkt. No. 62 at 5-22.[1])  The Court summarizes and supplements the facts as necessary for

clarity and to discuss the grounds raised by Petitioner.

### A.    Indictment

In March 2012, Petitioner was indicted on four counts, all relating to alleged distribution

of oxycodone within Otsego County.  (Dkt. No. 64-1 at 92-93.)  In Count One, he was charged

with operating as a major trafficker, and it was alleged that, as a profiteer, he sold a narcotic drug

on one or more occasions between July 1 and December 31, 2011, and the proceeds of those

sales had an aggregate value of $75,000 or more.  *Id*. at 92.  In Count Two, he was charged with

first degree criminal possession of a controlled substance on December 19, 2011.  *Id*.  Counts

Three and Four charged third degree possession of a controlled substance on October 13, 2011.

*Id*. at 92-93.

### B.    Trial

In October 2012, Petitioner proceeded to a jury trial before the Hon. Brian D. Burns of

Otsego County Court.  Petitioner was represented by Michael Jacobs, Esq.  The Otsego County

District Attorney ("DA") John Muehl, Esq.[2] was for the People.  The bulk of the testimony

---

[1]  Citations to page numbers in the filings refer to the pagination CM/ECF automatically
generates.  Excerpts from the record are reproduced exactly as they appear in the original and
errors in spelling, punctuation, and grammar have not been corrected unless indicated.

[2]  The Court refers to Attorney Muehl as the Otsego DA, the district attorney, and the prosecutor
throughout the Report-Recommendation.

against Petitioner was provided by nine cooperating witnesses: Christine Ramsell, Kevin Baker,

Sara Baker, Shelby Mochrie, Crystal Gonsalves, Clarence Vanier, Jeffrey Vollkommer, Kate

Joslyn, and Scott Burns.  Two Otsego County Jail inmates and an auditor for the Oneida Indian

Nation Gaming Commission also testified for the People.  Numerous law enforcement personnel

testified regarding their investigations, surveillance, execution of search warrants, chain of

custody, and forensics.  As summarized by the Appellate Division, Third Department:

> Following a lengthy investigation by numerous law enforcement
> agencies into narcotics trafficking in Otsego County, [Petitioner]
> was charged with various crimes arising from his alleged
> possession and sale of significant quantities of oxycodone powder
> between July and December 2011. . . .  The trial testimony
> established [Petitioner] sold large quantities of oxycodone to
> Christin[e] Ramsell and Clarence Vanier who would, in turn, sell
> or distribute the drugs to others in the Otsego area.

*People v. Major*, 143 A.D.3d 1155, 1158 (3d Dep't 2016).[3]

Ramsell testified that she first met Petitioner in February or March of 2011.  She bought

oxycodone from Petitioner on behalf of a drug dealer, who paid Ramsell "$250 to pick it up each

time."  (Dkt. No. 64-6 at 144.)  But when that drug dealer went to jail in mid-July 2011, Ramsell

began buying oxycodone directly from Petitioner.  *Id.*

Ramsell estimated that between July and October 2011, she bought oxycodone from

Petitioner approximately every seven to ten days.  *Id.* at 150-511.  During each purchase,

Ramsell paid $10,000 to Petitioner for 66 grams of oxycodone.  *Id.* at 146-48.  She explained

---

[3] Ramsell and Vanier, who operated independently of one another, were investigated by two
separate agencies.  *Id.*  The Otsego County Sheriff's Office ("OCSO") investigated Ramsell's
operation.  The New York State Police ("NYSP") investigated Vanier's drug distribution.  The
separate investigations by the two law enforcement agencies culminated in the execution of
search warrants on two different dates: (1) the OCSO executed its search warrant at Ramsell's
house on October 13, 2011; (2) and the NYSP executed and searched the homes of Vanier,
Vollkommer, and Burns on December 20, 2011.

that "[n]ormally you get 50 grams [for $10,000] but [Petitioner] threw in an extra." *Id*. at 147.
Ramsell and her boyfriend, Luke MacCracken would use the 16 grams of oxycodone themselves
and sell the rest. *Id*. at 150-51.

In July 2011, Ramsell lived in a former boyfriend's house on Heritage Hill Road
("Heritage Hill") with MacCracken and two friends, Sara Baker and her boyfriend Eric Jones.
*Id*. at 145. All four, and two additional friends, Kevin Baker and his girlfriend Shelby Mochrie,
participated in Ramsell's drug operation by counting money, packaging, and selling. *Id*. at 149.
When Ramsell needed a fresh supply of oxycodone, she called Petitioner and "he'd show up"
and bring the oxycodone powder to her in a plastic bag. *Id*. at 147. Ramsell and Petitioner
always exchanged the drugs and money in private. After Petitioner would leave, Ramsell and
her friends would repackage the bulk oxycodone for individual sale. The group would "set up an
assembly line to bag out and get ready for distributing," measuring a small amount of powder
into glassine envelopes that they would then sell for $20 each. *Id*. at 150, 157, 280-82, 285, 385-
90, Dkt. No. 64-7 at 34, 56-58, 69-70.

Sara Baker testified that Petitioner came to Heritage Hill approximately 20 times between
July and early September 2011. (Dkt. No. 64-7 at 33-34.) Petitioner would pick Ramsell up,
and, when Ramsell returned, she "had a plastic baggy of the powder and when it was gone,
[Ramsell] would meet with [Petitioner,] and then she would come back and it would be full
again and she'd get everything ready to sell it." *Id*. at 51.

In early September 2011, Ramsell, MacCracken, Sara Baker, and Eric Jones were asked
to leave Heritage Hill. On September 7, 2011, and the four moved to a mobile home in Wells
Bridge, New York that Petitioner owned ("Wells Bridge"). Ramsell testified that "there was no
agreement" on rent, and when asked if she did anything for Petitioner while living at the house,

she responded that "I just bought and sold drugs." (Dkt. No. 64-6 at 154.) Ramsell continued to pay Petitioner $10,000 for 66 grams of oxycodone. *Id*. at 148.

Ramsell testified that at first, Petitioner would bring the oxycodone with him to Wells Bridge, but then Petitioner "brought a big bag of it to the house and after that he would just weigh it out." Petitioner kept the bag in Ramsell's room underneath the dresser. *Id*. at 153-56. She explained that if she wanted some, she "would have to call him up or he'd stop by, just tell him I need more," then Petitioner "would weigh it out and [she] would buy it." *Id*. at 156. The bag of oxycodone hidden beneath Ramsell's dresser belonged to Petitioner; Ramsell could not take or sell any of it until she had purchased it from Petitioner. *Id*.

Shelby Mochrie testified that she saw Petitioner at Wells Bridge about three times and he brought drugs to the house once. (Dkt. No. 64-7 at 59, 68.) Sara Baker also saw Petitioner frequently at Wells Bridge. Petitioner would arrive early in the morning, Sara Baker would wake Ramsell up, and Petitioner would meet with Ramsell either in Ramsell's bedroom or [Petitioner] would tell us to go in our bedrooms or whatever." *Id*. at 35.

Kevin Baker, in addition to working on the assembly line packaging the oxycodone for sale, sold oxycodone for Ramsell. (Dkt. No. 64-6 at 282-84.) From approximately July to mid-October 2011, Kevin Baker would sell between 10 and 20 bundles—between 100 and 200 glassine bags of oxycodone—a day. *Id*. at 283. Ramsell charged Kevin Baker $150 per bundle; he would re-sell each bundle for either $200 or $250. He estimated that during this time period he sold approximately $2000 in oxycodone every day. *Id*. at 284.

Crystal Gonsalves testified that she met Petitioner, whom she referred to as "D", in August 2011. (Dkt. No. 64-7 at 80-81, 84.) From August through October 2011, Gonsalves purchased oxycodone from Ramsell, MacCracken, and Jeffrey Vollkommer for her personal use.

*Id*. at 85-87.  She testified she went with Petitioner to Ramsell's house on Heritage Hill once.  *Id*. at 85.  While there, Gonsalves saw Ramsell "bagging up the Oxy powder and D sitting there." *Id*.  Gonsalves also went with Petitioner to Wells Bridge on two occasions.  *Id*. at 80-81.  In late August 2011, she went with Petitioner to Wells Bridge.  On the way, Petitioner gave her oxycodone, which she snorted in the car.  *Id*. at 83.  Once at Wells Bridge, she "did a couple more lines of Oxy" that Petitioner had retrieved from the bedroom.  *Id*.  Gonsalves went with Petitioner to Wells Bridge a second time to pick up money from Ramsell, who was then living there.  When they got there, Gonsalves and Petitioner went into the living room and Ramsell started to give Petitioner money.  Petitioner stopped her, saying "'not here' and they went to the bedroom."  *Id*. at 83.  Gonsalves did not see what happened in the bedroom.  She eventually asked Petitioner where he was getting his supply of oxycodone from and she was told "Covidien[4] is a great place."  *Id*. at 89.

In total, Ramsell testified she made approximately 10 purchases at Heritage Hill and 8 to 10 purchases at Wells Bridge.  She continued to purchase oxycodone powder from Petitioner until October 13, 2011, when the OCSO executed a search warrant at Wells Bridge and she was arrested.  (Dkt. No. 64-6 at 158.)  Between July and October 13, 2011, Petitioner sold Ramsell at least $90,000 worth of oxycodone.  *Id*. at 150-52, 154, 158, 166.[5]

---

[4]  "Covidien, a healthcare company, had a plant located in Hobart, New York, where oxycodone was manufactured, according to a January 15, 2013, newspaper article in an Oneonta newspaper, which also discussed Petitioner's criminal case."  (Dkt. No. 62 at 10 n.13.)  *See also* https://www.thedailystar.com/news/local_news/police-drugs stolenfromcovidien/article_98b19309-3de8-55ed-8250-f286997e353d.html (last visited Sept. 3, 2021).

[5]  The $90,000 figure is based on Ramsell purchasing $10,000 in oxycodone from Petitioner every 10 days during the 90-day period between July 15, 2011, and October 13, 2011.  Ramsell also estimated, however, that she made 30 purchases in total from Petitioner.  (Dkt. No. 64-6 at

OCSO Investigator Michael Ten Eyck testified that Ramsell and MacCracken had become suspects in a narcotics investigation conducted by its office following undercover buys of oxycodone powder that was traced back to the pair. (Dkt. No. 64-5 at 157-58.) During the execution of the search warrant at Wells Bridge on October 13, 2011, police recovered oxycodone powder, glassine bags, U.S. currency, marijuana, and various weapons and ammunition, including a pistol and rifle found in Ramsell's bedroom. (Dkt. No. 64-5 at 160-61, Dkt. No. 64-6 at 23, 34-35.) A large bag containing approximately 84 grams of oxycodone was found in Ramsell's bedroom underneath the dresser. (Dkt. No. 64-5 at 161-63; Dkt No. 64-6 at 65; Dkt. No. 64-8 at 58.) Ramsell testified that this oxycodone belonged to Petitioner, and was the supply from which Petitioner would measure out the amount he would sell to Ramsell. (Dkt. No. 64-6 at 159.) Also in Ramsell's bedroom police found a bundle—ten glassine envelopes— of oxycodone. (Dkt. No. 64-5 at 162-63, 167.) Ramsell testified that the bundle of oxycodone belonged to her as she had already purchased these drugs from Petitioner. (Dkt. No. 64-6 at 160.)

Petitioner also sold oxycodone through Clarence Vanier, also known as "C," Petitioner's friend for "17 years plus." (Dkt. 64-7 at 123-24.[6]) Prior to July 2011, Vanier had sold cocaine, but never sold oxycodone until Petitioner came to his house, brought "Oxy powder", and told him they could "make a lot of money from this. It's white gold." *Id*. at 166. Thereafter, Petitioner dropped off a supply of oxycodone at Vanier's house, and it was Vanier's job to get

---

161-62.) This discrepancy may be due to Ramsell's inclusion of the times that she picked up oxycodone on behalf of a drug dealer who went to jail in July 2011.

[6] Vanier testified Petitioner was "like family. When I say like family, at one point I would have gave my life for him and vice versa, like family." (Dkt. No. 64-7 at 129.) He further stated it was "very difficult" for him to testify at Petitioner's trial. *Id*.

the oxycodone "sold." *Id*. at 126. Vanier, in turn, gave the oxycodone to his friend, Jeffrey

Vollkommer to sell. *Id*. at 126-30. Vollkommer would sell the oxycodone, and return to

Vanier's home with the proceeds. *Id*. at 130, 194. Vollkommer paid Vanier $190 per gram for

the oxycodone, which would go to Petitioner. *Id*. at 202. Vanier testified he was compensated

for his "services" in "cash" by Petitioner. *Id*. at 130-32. When Petitioner picked up the money

for the oxycodone that Vollkommer had sold, Petitioner would pay Vanier with a portion of the

proceeds. Petitioner also gave Vanier gambling money when they went to the Turning Stone

Casino together. Between July and December 2011, Petitioner paid Vanier between $15,000 and

$20,000 for selling the oxycodone Petitioner had supplied him. *Id*. at 132. (Dkt. No. 64-7 at

123-24, 126, 128, 130, 132, 166, 194, 201.)

Vanier estimated that Petitioner supplied him with approximately 600 grams of

oxycodone between July 1 and December 20, 2011. *Id*. at 125. Petitioner gave Vanier 50 to 100

grams in July, 100 to 150 grams in August, approximately 100 grams in September, 100 grams

in October, and approximately 300 grams on December 19, 2011, a "[c]ouple hours" before a

search warrant was executed at his home on December 20, 2011. *Id*. at 125, 127-31. Vanier did

not testify regarding whether Petitioner supplied him with any oxycodone in November. *See id*.

Vollkommer, who was addicted to oxycodone, began selling it in July 2011 to support his

addiction. (Dkt. No. 64-7 at 200-01.) He sold approximately three-quarters of what he picked

up from Vanier and used the rest himself. *Id*. at 202. Vollkommer saw Petitioner, who he called

"D" at Vanier's house one time when Vollkommer was picking up a supply of oxycodone.

Petitioner gave Vanier a "baggie with some powder in it." *Id*. at 202-03. He also testified that

he tried to buy oxycodone directly from Petitioner once when he was at a bar with Vanier and

Petitioner in July 2011, but the price was too high, and the deal was never consummated. *Id*. at 194-9, 201-03.

Kate Joslyn also referred to Petitioner as "D". At the time of trial, she was incarcerated for selling oxycodone. She met Vanier through Petitioner and had been to Vanier's home between five and ten times, each time with Petitioner. Joslyn testified that she "copped drugs in Wells Bridge." *Id*. at 235.

Scott Burns, a friend of Vollkommer's, testified that he met Petitioner in Oneonta in August 2011 and bought 16 grams of oxycodone powder for $3,300 directly from Petitioner. (Dkt. No. 64-7 at 247.) After this one time purchase, Burns purchased oxycodone from Vollkommer. *Id*. at 246-48; Dkt. No. 64-8 at 11.

On December 20, 2011, the NYSP executed a search warrant at Vanier's home at 5:41 a.m. (Dkt. No. 64-6 at 84; Dkt. No. 64-1 at 522.) NYSP Investigator Gregory Ellison and others recovered approximately 307 grams of oxycodone from Vanier's basement. (Dkt. No. 64-6 at 85; Dkt. No. 64-8 at 94, 97-98.) Vanier testified that he had obtained this supply of oxycodone from Petitioner a "[c]ouple hours" before the police executed the search warrant. (Dkt. No. 64-7 at 130-31.)

The People also offered the testimony of two Otsego County Jail inmates, Russell Stell and Leo Szymanski. Petitioner told Russell Stell that "he was involved in selling oxy powder and [that Ramsell and MacCracken] used to work for him" selling oxycodone. (Dkt. No. 64-8 at 22.) Stell knew MacCracken because he had previously shared a cell with him. *Id*. at 24.

Leo Szymanski, who called Petitioner "D", testified that Petitioner told him he and Vanier "were partners." *Id*. at 137. Stell testified that Petitioner and Vanier, who was also incarcerated at the jail, "were going back and forth about who's blaming who and whose mistake

it was and how [Petitioner] left Clarence hanging." *Id*. at 136.  Petitioner told Szymanski that he

had told Vanier "to stop doing what he's doing.  It's getting hot, and he should have took a

vacation like he did, like [Petitioner] did, that he should have went away." *Id*. at 137, 143.

Petitioner also told Szymanski about the various property he owned, including a "big

property" in Hobart and property in Wells Bridge. *Id*. at 138-39.  Petitioner said that he had been

planning to rent Wells Bridge, but that "he knew a girl name Christine and she needed a place to

stay, so he put Christine in there" and that she and "her boyfriend Luke" moved in " and that's

where the oxycodone and cocaine was, and he had them there as like distributing . . . ." *Id*. at

139.

Petitioner told Szymanski that he traveled to places "where rich people" would go,  and

that he also spent a lot of time at casinos " with the proceeds from the drugs . . .  he would take

his team there . . . they would do VIP things . . .  That's how the proceeds from the [drug]

money, it would become legitimate . . . It would be legitimate funds as winnings, so he would be

able to claim it." (Dkt. No. 64-8 at 137-38.)  Petitioner also explained to Szymanski the steps he

took to try to insulate himself from criminal liability.  Petitioner would do business only with

"the person he was doing the business with.  He would have what he called like a cushion in

between.  This way, they couldn't get him for distributing." *Id*. at 138-39.

Lastly, an auditor for the Oneida Indian Nation Gaming Commission, which oversees the

regulatory compliance of the Turning Stone Resort and Casino, testified regarding Petitioner's

gambling activity at the Turning Stone Casino.  (Dkt. No. 64-9 at 5-6.)  Petitioner had a

"Diamond Card account," a loyalty program that rewarded and kept track of each transaction the

patron made at the casino. *Id*.  The auditor testified that between July 1 and December 31, 2011,

Petitioner's total "buy-in"—the amount that Petitioner "brought to the table" when he gambled at

the Turning Stone Casino—was $611,050.  *Id*. at 15-17.  Petitioner's total losses during this period were $91,450.  *Id*. at 17.

Petitioner did not testify.  Clarence Vanier's wife, Melody Vanier, testified on behalf of the defense that Petitioner did not have a key to her house and that she had a home security system to which Petitioner did not have access.  *Id*. at 49-50.  She denied seeing Petitioner with "zip lock bags of powder" or seeing him give any such bags to her husband.  *Id*. at 50.

### C.    Verdict and Sentence

On October 19, 2012, the jury found Petitioner guilty as charged of operating as a major trafficker, first degree criminal possession of a controlled substance (the oxycodone recovered from Vanier's home on December 20, 2011), and two counts of third degree criminal possession of a controlled substance (the oxycodone recovered underneath Ramsell's dresser at Wells Bridge on October 13, 2011).  (Dkt. No. 64-1 at 94-95; Dkt. No. 64-10 at 5-8.)

On January 19, 2013, the court sentenced Petitioner, as a second felony drug offender with a prior violent conviction, to an aggregate prison term of from 55 years to life as follows: from 20 years to life for operating as a major trafficker (Count One); a determinate 15 year term to be followed by 5 years of post-release supervision for first degree criminal possession of a controlled substance (Count Two), and two determinate 10 year terms for third degree criminal possession of a controlled substance (Counts Three and Four) to be followed by 3 years of post-release supervision.  (Dkt. No. 64-1 at 122.)  Each sentence was imposed consecutively.  *Id*.

### D.    CPL § 330.30 Motion

Petitioner filed a motion to set aside the verdict pursuant to New York Criminal Procedure Law ("CPL") § 330.30, arguing, in relevant part, that the jury should have been instructed that certain cooperating witnesses were accomplices as a matter of law and that the

three drug possession charges were lesser included offenses of the operating as a major trafficker charge. (Dkt. No. 64-1 at 96-108.) The trial court denied Petitioner's motion. *Id*. at 118-21.

### E. Direct Appeal

In a counseled brief to the Appellate Division, Third Department, Petitioner raised five claims on direct appeal: (1) the trial court erred in denying the defense request for an accomplice instruction regarding all of the cooperating witnesses; (2) the trial court erred in failing to conduct an inquiry after receiving a note regarding defense counsel's facial expressions; (3) the trial court improperly precluded cross-examination regarding the ownership of objects found near the powder in the Wells Bridge house; (4) consecutive sentences were improper; (5) the sentence was harsh and excessive. (Dkt. No. 64-1 at 1-47.)

The Third Department modified Petitioner's sentence to run the two third degree criminal possession counts concurrently (Counts Three and Four), reducing Petitioner's sentence to an indeterminate term of from 45 years to life, and otherwise affirmed the judgment of conviction. *People v. Major*, 143 A.D.3d 1155, 1156-58 (3d Dep't 2016). On January 26, 2017, the New York Court of Appeals denied Petitioner's counseled leave application raising each of the grounds raised in his appellate brief. (Dkt. No. 64 at 203-11); *People v. Major*, 28 N.Y.3d 1147 (2017).

### F. CPL § 440.10 Motion

In 2018, Petitioner filed a *pro se* motion to vacate his conviction pursuant to CPL § 440.10 (the "440.10 motion") on the grounds that: (1) the prosecution committed misconduct by failing to disclose: (a) exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), (b) witness statements that should have been turned over pursuant to *People v. Rosario*, 9 N.Y.2d 286 (1961), and (c) the cooperation agreements of Vollkommer, Vanier, Ramsell, and

Szymanski; (2) the prosecution committed misconduct and the indictment was defective because Vanier testified falsely in the grand jury and at trial that Petitioner was his drug supplier; (3) newly discovered evidence—the search warrant application for the warrants executed on December 20, 2011, at the homes of Vanier, Vollkommer, and Burns (the "Vanier search warrant application"), and transcribed intercepted wiretapped communications—would have changed his trial's outcome; and (4) he was deprived of his federal and state constitutional rights to the effective assistance of counsel at trial.  (Dkt. No. 64-1 at 212-56.)

Petitioner filed a *pro se* supplemental affidavit adding the claim that his "Confrontation Clause and fair trial rights" were denied because the prosecution withheld and failed to preserve recorded post-arrest interviews of Vollkommer and Burns that the NYSP destroyed in 2014.  *Id.* at 559-63.

On June 4, 2018, Judge Burns (the "440 court"), denied Petitioner's motion.  (Dkt. No. 64-1 at 586-589.)  Petitioner then filed a motion to renew his 440.10 motion.  *Id.* at 590-650, 653-55.  On June 29, 2018, the 440 court denied Petitioner's motion to renew.  *Id.* at 656-57. Petitioner then sought leave to appeal, *id.* at 658-95, which, on December 4, 2018, was denied by the Third Department, *id.* at 696.  Petitioner then sought reconsideration, which was similarly denied by the Third Department on January 24, 2019.  *Id.* at 697-710.

## II.   THE PETITION

In Petitioner's *pro se* second amended federal habeas petition, originally filed March 23, 2018, Petitioner contends that he is entitled to habeas relief because: (1) the trial court erred in refusing to give an accomplice witness instruction as to all cooperating witnesses; (2) the trial court erred in failing to conduct an inquiry after receiving a note regarding defense counsel's facial expressions; (3) the trial court improperly precluded cross-examination regarding the

ownership of objects found near the powder in the Wells Bridge house; (4) consecutive sentences were improper; (5) the sentence was harsh and excessive; (6) the prosecution committed misconduct when it intentionally suppressed *Brady* material (7) the prosecution committed misconduct when it intentionally failed to preserve *Brady* material; (8) the prosecution knowingly allowed a key prosecution witness to testify falsely, when it knew the testimony to be false and failed to correct it; (9) he found newly discovered evidence, which if produced at trial, would have produced a different outcome in the proceeding; (10) his trial counsel was ineffective; (11) the trial court unreasonably denied without a hearing his 440.10 motion; (12) the trial court erroneously failed to address Petitioner's *Brady's* claims in his motion to renew the 440.10 motion, basing its decision entirely on a *Rosario* analysis; and (13) the cumulative effect of all the foregoing violations deprived Petitioner of the right to due process.  (*See generally* Dkt. No. 35.)

## III.   STANDARD OF REVIEW

### A.   Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, . . . thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quotation marks and other citations omitted)); 28 U.S.C. § 2254(b)(1).  The prisoner must "fairly present" his claim in each appropriate state court, including the highest court with powers of discretionary review, thereby alerting that court to the federal nature of the claim. *Id*.; *Bossett v. Walker*, 41 F.3d 825, 828 (2d Cir. 1994).

B.    Merits

When reviewing a habeas petition, a federal court is limited to deciding whether a

conviction violated the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2241.

Relief does not lie for errors of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991);

*DiGuglielmo v. Smith*, 366 F.3d 130, 136-137 (2d Cir. 2004).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a

federal court lacks the power to grant a writ of habeas corpus under 28 U.S.C. § 2254

> unless the adjudication . . . (1) resulted in a decision that was
> contrary to, or involved an unreasonable application of, clearly
> established Federal law, as determined by the Supreme Court of
> the United States; or (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light of the evidence
> presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "contrary to" clearly established Supreme Court precedent "if the state

court arrives at a conclusion opposite to that reached by the [Supreme Court] on a question of

law or if the state court decides a case differently than [the Supreme Court] on a set of materially

indistinguishable facts," or if the state court identifies the appropriate legal standard, but

unreasonably applies it to the facts of the petitioner's case.  *Williams v. Taylor*, 529 U.S.412  413

(2000).  The lower court may not grant the writ if it concludes "in its independent judgment" that

the state-court decision applied clearly established federal law erroneously or incorrectly; rather,

the application must also be unreasonable.  *Id*. at 411.

In order for the application to be "unreasonable," there must be "some increment of

incorrectness beyond error," but that increment may not be too great, otherwise habeas relief

would be limited to those state court decisions that are "so far off the mark as to suggest judicial

incompetence." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Francis S. v. Stone*,

15

221 F.3d 100, 111 (2d Cir. 2000)).  A state court's decision must stand as long as "fairminded

jurists could disagree on the correctness . . . of the decision."  *Harrington v. Richter*, 562 U.S.

86, 101 (2011) (citation and quotation marks omitted).  In addition, factual determinations made

by the state court are presumed to be correct, and the petitioner bears the burden of rebutting the

presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

In order to apply this standard under the AEDPA, the petitioner's claim must have been

"adjudicated on the merits" in the state court proceedings.  28 U.S.C. § 2254 (d)(1); *see also Day

v. Taylor*, 459 F. Supp. 2d 252, 256 (S.D.N.Y. 2006) (a federal court's ability to review a habeas

petition depends on whether the state court adjudicated the petitioner's claims on the merits or on

procedural grounds).  If the state court failed to decide a claim "on the merits," the pre-AEDPA

standard of review applies, and both questions of law and mixed questions of law and fact are

reviewed *de novo*.  *Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).

## IV.    DISCUSSION

### A.    Ground One: Jury Charge

Petitioner claims the trial court erred in refusing to instruct the jury that Kevin Baker,

Sara Baker, Shelby Mochrie, Crystal Gonsalves, Jeffrey Vollkommer, Kate Joslyn, and Scott

Burn were accomplices as a matter of law.  (Dkt. No. 35 at 6, 12-13.)  Respondent argues

Petitioner's jury instruction claim fails to allege a violation of his federal constitutional rights,

and is thus not cognizable on habeas review.  (Dkt. No. 62 at 22-23.[7])

---

[7]  Respondent also argues that even if Petitioner's jury charge claim were construed to allege a
violation of his federal constitutional rights, such a claim would be unexhausted, because he
failed to raise it in federal constitutional terms in state court (Dkt. No. 64-1 at 25-33) and,
because this would be a record-based claim, procedurally defaulted.  (Dkt. No. 62 at 23 n.7.)  *See
O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); 28 U.S.C. § 2254(b)(1)(A); CPL §
440.10(2)(c) (barring collateral review of claims that could have been raised on direct appeal);
*Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991); *Ramirez v. Attorney General*, 280 F.3d 87, 94

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle*, 502 U.S. at 67-68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). The adequacy of a state court's jury instructions is generally a matter of state law. *Cupp v. Naughten*, 414 U.S. 141, 146 (1973).

"'In order to obtain a writ of habeas corpus in federal court on the ground of error in a state court's instructions to the jury on matters of state law, the petitioner must show not only that the instruction misstated state law but also that the error violated a right guaranteed to him by federal law.'" *Blazic v. Henderson*, 900 F.2d 534, 540 (2d Cir. 1990) (quoting *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985)). Failure to give a properly requested jury charge does not by itself violate a petitioner's right to due process. *Id.* at 541 ("A mere error of state law does not deny a defendant his right to due process."). "For an erroneous state jury charge to result in a federal constitutional deprivation, 'the ailing instruction by itself [must have] so infected the entire trial that the resulting conviction violates due process.'" *Id.* (quoting *Cupp*, 414 U.S. at 147).

Petitioner's claim is based on the accomplice corroboration requirement under New York State law, CPL § 60.22. (Dkt. No. 35 at 12-13.) On direct appeal, the Appellate Division determined "County Court properly charged the jury that only Ramsell and Vanier, as purchasers of the drugs at issue, were accomplices as a matter of law." *Major*, 143 A.D.3d at 1158. The Appellate Division explained:

---

(2d Cir. 2001). The Court nonetheless may deny the claim on the merits and with prejudice. *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). This is particularly true where the grounds raised are meritless. *See Rhines v. Weber*, 544 U.S. 269, 277 (2005).

> Notwithstanding the fact that several of the witnesses at issue were either offered immunity from prosecution or had cooperated with the People in exchange for less stringent treatment of their own illegal conduct, [Petitioner] has not shown that any of the seven witnesses who were not charged as accomplices as a matter of law participated in a criminal offense based upon the facts and conduct constituting the crime as operating as a major trafficker . . . [W]hile these witnesses admittedly engaged in criminal conduct following [Petitioner's] sale of oxycodone to Ramsell and Vanier, such conduct was not "based upon the same or some of the same facts or conduct which constituted the offense charged."  In other words, the facts and conduct constituting the crime of operating as a major trafficker did not involve any possession or sale of drugs in which the challenged witnesses participated . . . As the seven cooperating witnesses at issue were not accomplices as a matter of law, County Court properly refused to so charge the jury.

*Id.* at 1157-58 (internal citations omitted).

This Court is bound by that determination.  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT & T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law[.]").  A determination of state law by a state intermediate appellate court is also binding in a federal habeas action.  *See Hicks v. Feiock*, 485 U.S. 624, 629-30 & n. 3 (1988) (noting that state appellate court's determination of state law is binding and must be given deference).

In addition, there is no federal constitutional rule requiring the corroboration of accomplice testimony.  *Caminetti v. United States*, 242 U.S. 470, 495 (1917) ("there is no absolute rule of law preventing convictions on the testimony of accomplices if juries believe them"); *see Young v. McGinnis*, 411 F. Supp. 2d 278, 297 (E.D.N.Y. 2006) ("[f]ederal law does not require a coconspirator charge to the jury requiring corroborating evidence[.]"), *aff'd*, 319 F.

App'x 12, 13 (2d Cir. 2009) ("[R]egardless of whether there was a violation of state law in denying [the petitioner's] request for an accomplice-corroboration instruction, there was no violation of federal law, let alone of any federal constitutional right.") (summary order); *see also United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) ("Any lack of corroboration of an accomplice's or co-conspirator's testimony goes merely to the weight of the evidence, not to its sufficiency[.]"), *cert. denied*, *Rivera v. United States*, 528 U.S. 875 (1999).

Accordingly, the trial court's decision not to instruct the jury on accomplice liability as to all of the cooperating witnesses did not violate Petitioner's federal constitutional right to a fair trial.  *See Romero v. Napoli*, No. 08 CIV 8380, 2013 WL 3583724, at *15 (S.D.N.Y. July 15, 2013), *report-recommendation adopted*, 2013 WL 6170636 (S.D.N.Y. Nov. 25, 2013) ("Thus, even if [CPL §] 60.22 was violated, such a violation cannot be a basis for federal habeas corpus relief."); *Player v. Artus*, No. 06 CV 2764, 2007 WL 708793, at *5 (E.D.N.Y. Mar. 6, 2007) (finding the petitioner's claim that the trial court violated his due process rights by failing to conclude that three witnesses were his accomplices, and failing to instruct the jury that a defendant may not be convicted solely upon the uncorroborated testimony of an accomplice witness, "sounds in state law exclusively, and does not present a federal due process claim."); *Williams v. Marshall*, No. 09 Civ. 7411, 2011 WL 2175810, at *14 (S.D.N.Y. Mar. 30, 2011) (accomplice-corroboration claim is "purely an artifact of New York statutory law" and does not implicate due process).

Therefore, the Court recommends denying and dismissing ground one of the petition.

### B.    Ground Two: Jury Note Inquiry

Petitioner contends "[t]he trial court erred in failing to conduct an inquiry after receiving a note regarding defense counsel's facial expressions."  (Dkt. No. 35 at 14-16.)  Respondent

argues that to the extent that Petitioner raises a Sixth Amendment claim that he was denied the right to an impartial jury, the Appellate Division did not unreasonably apply Supreme Court precedent in denying this claim on the merits.  (Dkt. No. 62 at 24-27.[8])

On the morning of the third day of trial, Judge Burns notified the attorneys that he had received a note from the jury, signed by the foreperson, stating:

> The defendant's attorney is making inappropriate facial and eye gestures at us.  It is as though he is trying to lead the jury and influence us.

(Dkt. No. 64-6 at 273-74.)  The court stated it would remind the jurors to decide the case objectively and free of emotion toward the parties and directed defense counsel to remain at counsel table during the rest of his examination of the witnesses.  *Id.* at 274-75.  Defense counsel responded that the note presented "enough of an issue so perhaps you should voir dire the individual jurors with regard to this issue and see if this is such a severe problem that somebody is unable to sit because they have been so affected it creates a problem for my client."  *Id.* at 275-76.  The prosecutor countered that if any juror had been unable to sit, the foreperson would have said so explicitly.  *Id.* at 276.  The court agreed with the prosecutor, ruling no further inquiry was necessary because the jury was "aware of their ability to communicate" with the court and that the note did not contain any explicit declaration that "there were so offended by this . . . that they couldn't decide the case."  *Id.*

---

[8]  Respondent also contends Petitioner does not clearly raise a cognizable federal claim by asserting that the trial court erred by not individually questioning the jurors regarding their note. (*See* Dkt. No. 62 at 24 n.8.)  However, as discussed *supra*, the Court may deny this claim on the merits and with prejudice.  *See* Point IV.A.n.4.

When the jury returned to the courtroom, the court informed them that it had addressed

the issue raised in the note with the attorneys and then instructed the jury as follows, in relevant

part:

> I would remind each of you jurors that you have promised to
> decide this case fairly and impartially . . . [I]f anything . . . any of
> the attorneys have said or the manner in which they are speaking
> has made you uncomfortable, . . . put that out of your mind . . . .
> You're to decide this case based on the facts before you.  If, as we
> proceed through this trial, any of you individually find that you've
> become so aggravated or hostile based on anything that anyone,
> any of the attorneys has said or done to the point where you can't
> be fair in this case any longer and you're going to make a decision
> based on who you like better, so to speak, you need to let me know
> and you can do that just by sending a note out.  But unless I hear
> that from you, I will trust you to do your oath, to decide this case
> fairly and impartially based on the evidence and not on anything
> else.

*Id*. at 277.

Here, Petitioner contends the trial court should have conducted an "inquiry," but does not

cite any federal law in support of this argument.  (Dkt. No. 35 at 14-15.)  In asserting this claim

on direct appeal, Petitioner cited to New York State case law, with primary reliance placed on

the case of *People v. Buford*, 69 N.Y.2d 290 (1987)[9] and CPL § 270.35(1).[10]  (Dkt. No. 64-1 at

33-38.)  The Appellate Division, in rejecting Petitioner's arguments, held:

> County Court providently exercised its discretion in denying
> [Petitioner's] request to conduct an inquiry of the jurors after
> receiving a note indicating that defense counsel was making
> "inappropriate facial and eye gestures at [them] as though he is

---

[9]  In *Buford*, the New York Court of Appeals "create[d] a framework by which trial courts could
evaluate sworn jurors who, for some reason during the trial, may 'possess[] a state of mind which
would prevent the rendering of an impartial verdict.'"  *People v. Mejias*, 21 N.Y.3d 73, 79
(2013) (quoting *Buford*, 69 N.Y.2d at 298).

[10]  New York law provides that where a trial court "finds, from facts unknown at the time of the
selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in
misconduct of a substantial nature, but not warranting the declaration of a mistrial, the court
must discharge such juror."  N.Y. Crim. Proc. Law § 270.35(1).

> trying to lead . . . and influence [them]."  When a sworn juror's comments or actions raise a question concerning his or her ability to be impartial, the trial court must question each allegedly unqualified juror individually in camera in the presence of the attorneys and defendant.  Here, the note did not indicate impartiality on behalf of any of the jurors.  Rather, it merely expressed irritation with the mannerisms and/or behavior of counsel, which—by itself—would not be a basis for discharge.  Thus, a *Buford* inquiry was not required and County Court's instructions to all the jurors to disregard the manner of the attorneys and to alert the court if they believed they could not be fair and impartial for any reasons, including the conduct of either attorney, were sufficient.

*Major*, 143 A.D.3d at 1156-57 (internal citations omitted).

To the extent Petitioner claims that he is entitled to habeas relief because the trial court should have made a *Buford* inquiry under New York state law, as discussed above, federal habeas corpus relief is not available for state law errors that do not rise to the level of a violation of federal laws or the Constitution.  28 U.S.C. § 2254(a); *see Estelle*, 502 U.S. at 67-68.  Moreover, as noted above, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. at 76.  Here, inasmuch as the Appellate Division found a *Buford* inquiry was not required, *Major*, 143 A.D.3d at 1156-57, this Court is bound by that determination.  Thus, Petitioner's *Buford* claim does not provide grounds for habeas relief.

To the extent Plaintiff's "inquiry" claim does implicate federal constitutional issues, the Court agrees with Respondent that the claim should be denied.  (Dkt. No. 62 at 24-27.)  "[A]ll the Constitution guarantees is that a defendant be tried by an 'impartial jury.'"  *Garcia-Lopez v. Fischer*, No. 05 Civ. 10340, 2007 WL 1459253, at *13 (S.D.N.Y. May 17, 2007) (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1964)), *as amended* (May 18, 2007); *see also Smith v. Phillips*, 455 U.S. 209, 217 (1982) ("Due process means a jury capable and willing to decide the

case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.").

Notably, the note was read in open court, Petitioner was made aware of its contents, and defense counsel was permitted to offer suggestions on how the jury's concerns should be addressed.  Moreover, as the Appellate Division determined, "the note did not indicate impartiality on behalf of any of the jurors.  Rather, it merely expressed irritation with the mannerisms and/or behavior of counsel, which—by itself—would not be a basis for discharge." *Major*, 143 A.D.3d at 1156.  "Absent such evidence of bias on the part of [any of the jurors] petitioner's habeas claim fails."  *Paulino v. Griffin*, No. 16-CV-3839, 2019 WL 9362540, at *13 (S.D.N.Y. Aug. 26, 2019), *report and recommendation adopted*, 2020 WL 1673248 (S.D.N.Y. Apr. 6, 2020), *appeal dismissed*, No. 20-1578, 2020 WL 8361770 (2d Cir. Dec. 23, 2020), *cert. denied*, 141 S. Ct. 1447 (2021) (citation omitted).

Here, Petitioner articulates no basis for inferring bias from the conduct of any juror, and the record reveals none.  *See, e.g.*, *Garraway v. Goord*, No. 04-CV-1281 (LEK/DRH), 2007 WL 1593057, at *4 (N.D.N.Y. Jan. 5, 2007) ("Garraway does not claim that the juror was actually biased; he simply argues that she may have been biased and that the judge's refusal to question her about her interactions with law enforcement agents was a violation of his fundamental rights."), *report and recommendation adopted*, 2007 WL 1593057, (N.D.N.Y. May 31, 2007), *aff'd*, 324 F. App'x 98 (2d Cir. 2009).  Given the circumstances, there is no reason to believe there was actually any juror bias, and the trial court's actions were sufficient to avoid any prejudice.

For all these reasons, the trial court's decision not to conduct an "inquiry" was therefore neither "contrary to, [n]or involv[ing] an unreasonable application of, clearly established Federal

law," or "based on an unreasonable determination of the facts in light of the evidence presented" before it.  28 U.S.C. § 2254(d).  Accordingly, the Court recommends denying and dismissing ground two of the petition.

###    C.    Ground Three: Limitation on Cross-Examination

Petitioner next argues the trial court "erred in precluding defense counsel from cross-examining Investigator Michael Ten Eyck regarding ownership of items, including a gun and a billy club, found near the alleged oxycodone powder in the Wells Bridge property."  (Dkt. No. 35 at 16-17; Dkt. No. 64-1 at 38-43.)  On direct appeal, the Appellate Division rejected this claim, stating:

> [Petitioner] also claims that his cross-examination of a police witness was improperly curtailed.  Mindful that the scope and extent of cross-examination is committed to the sound discretion of the trial court, we discern no abuse of discretion here.  In any event, any error in that regard would be harmless beyond a reasonable doubt in light of the overwhelming evidence of [Petitioner's] guilt.

*Major*, 143 A.D.3d at 1158-59.  The Court finds that the Appellate Division's decision reasonably rejected Petitioner's argument and was not contrary to, nor an unreasonable application of, federal law.

A defendant in a state criminal prosecution has a right, guaranteed by the Sixth and Fourteenth Amendments to the Constitution, "to be confronted with the witnesses against him."  U.S. Const. Amend. VI; *see also Pointer v. Texas*, 380 U.S. 400, 401 (1965) (holding that the Sixth Amendment Confrontation Clause is made applicable to the states by the Fourteenth Amendment).  However, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam).

Trial courts "retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Moreover, the preclusion of the cross-examination "must not have been harmless, that is, it must have had a substantial and injurious effect or influence in determining the jury's verdict." *Alvarez v. Ercole*, 763 F.3d 223, 230 (2d Cir. 2014).

Here, Petitioner has failed to show that the court abused its wide discretion in limiting the cross-examination of Investigator Ten Eyck. During trial, defense counsel sought to ask Investigator Ten Eyck whether the police had tried to obtain fingerprints from a shotgun, pistol, and glassine bags found near the oxycodone powder they recovered in Ramsell's bedroom when executing the search warrant at Wells Bridge. (Dkt. No. 64-6 at 26-27.). The prosecutor objected on relevancy grounds because Petitioner was charged with possessing only the oxycodone, not any of the items found nearby. *Id*. at 27. Defense counsel responded that because it was a constructive possession case, ownership of the items near the drugs was relevant. *Id*. The trial court sustained the objection and precluded the inquiry as irrelevant. *Id*. at 28.[11]

Here, Petitioner contends, as he did on direct appeal, that "[t]he court took an excessively narrow view of the relevance of these objects, finding that any questions relating to them were

---

[11] In so doing, the court further explained, "You can ask questions about the powder if you wish, but these items that were seized, it's not, and I want the jury to understand, it's not even alleged that Mr. Major possessed these firearms or this, I believe it's called a billy club or some kind of dagger. So any questions relating to them really are not relevant." (Dkt No. 64-6 at 28.) Stated differently, the court found the probative value of the seized items, i.e. weapons, would have been outweighed by the risk of prejudice, and jury confusion.

not relevant because Petitioner was not charged with possessing them."  (Dkt. No. 35 at 16; *see also* Dkt. No. 64-1 at 38.)  Petitioner argues this was error because:

> (1) the ownership of objects found in close proximity to the powder was probative of the ownership of the powder itself; (2) guns and weapons are tools of the narcotics trade and ownership of such weapons was thus probative of who was really dealing drugs from the Wells Bridge house; and (3) ownership of the guns might have shed light on Ramsell's motive to falsely implicate Petitioner.

*Id*. at 39.  As noted above, the Appellate Division considered and rejected this argument on the merits.  *Major*, 143 A.D.3d at 1158-59.

Given these circumstances, the Appellate Division reasonably rejected Petitioner's claim. Whether the items recovered from Wells Bridge were sent to be fingerprinted was irrelevant and lacked probative value because the prosecution was not contesting that those items belonged to the occupants of the house, Ramsell and MacCracken, as opposed to Petitioner.  Moreover, the court's instruction indicates concerns of the prejudicial nature of the weapons.  *Id*. at 28.[12]

Further, Respondent argues there is no merit to Petitioner's claim that by precluding the question, he could not present the defense theory that if Ramsell and MacCracken owned the weapons, and they were not supplied by Petitioner, the "jury might infer that they were dealing drugs independently rather than through" Petitioner.  (Dkt. No. 35 at 16-17; Dkt. 62 at 30.)  The Court agrees.  Ramsell testified the pistol belonged to MacCracken and that the glassine bags were hers.  (Dkt. No. 64-6 at 160, 215.)  Thus, the defense had a basis for arguing that since he

---

[12]  In any event, later in his cross-examination, defense counsel returned to the topic, asking whether Investigator Ten Eyck had sent the recovered shotgun, pistol, scales, money, and oxycodone powder to the FBI lab in Washington for fingerprinting.  (Dkt. No. 64-6 at 33-34.) This time, the prosecutor did not object, and Investigator Ten Eyck answered the question.  He submitted some items to the lab for fingerprinting, but not the scales, pistol, or the shotgun.  *Id*.

did not own the pistol or the glassine bags, and there was no evidence that he owned the shotgun, Petitioner did not own the drugs found near these items on October 12, 2011.

Based on the foregoing, the Appellate Division's finding that the trial court had not abused its discretion in curtailing the cross-examination, and alternatively that any possible error was harmless beyond a reasonable doubt, was neither contrary to, nor an unreasonable application of, Supreme Court precedent. Therefore, the Court recommends denying and dismissing ground three of the petition.

### D.    Ground Four: Consecutive Sentences

Petitioner argues that the sentences for Counts Two, Three, and Four of the indictment, in which he was charged with possessing oxycodone, should have been imposed to run concurrently with the sentence for his major trafficking conviction charged in Count One of the indictment. (Dkt. No. 35 at 18-19; Dkt. No. 64-1 at 43-47.[13]) However, in his traverse, Petitioner "abandon[s]" this claim. (Dkt. No. 69 at 1.)

There is no "constitutionally cognizable right to concurrent, rather than consecutive, sentences." *United States v. McLean*, 287 F.3d 127, 136 (2d Cir. 2002) (quoting *United States v. White*, 240 F.3d 127, 135 (2d Cir. 2001)). "Whether a sentence should run concurrently or consecutively is purely an issue of state law and is not cognizable on federal habeas review." *Johnson v. New York*, 851 F. Supp. 2d 713, 722 (S.D.N.Y. 2012) (citations omitted). The imposition of consecutive sentences violates the Eighth Amendment "'only under extraordinary

---

[13]  As discussed, Petitioner raised this argument on direct appeal and the Appellate Division modified Petitioner's sentence to run the two counts of third degree criminal possession of a controlled substance concurrently "as both arose out of a single possession of oxycodone on October 13, 2011, reducing Petitioner's prison term to an indeterminate term of from 45 years to life, and otherwise found "no basis upon which to reduce the sentence imposed." *Major*, 143 A.D.3d at 1160. Petitioner does not challenge that aspect of the decision.

circumstances.'"  *Herrera v. Artuz*, 171 F. Supp. 2d 146, 151 (S.D.N.Y. 2001) (quoting *Salcedo v. Artuz*, 107 F. Supp. 2d 405, 414 (S.D.N.Y. 2000)).  Petitioner has not alleged that such extraordinary circumstances exist in this case, only a disagreement over the interpretation of state law.  Such claims are not redressable in a federal habeas corpus proceeding.  In any event, as noted, Petitioner has abandoned this claim.  (Dkt. No. 69 at 1.)

In light of the foregoing, the Court recommends denying and dismissing ground four of the petition.

### E.   Ground Five: Excessive and Harsh Sentence

Petitioner next argues his sentence was harsh and excessive.  (Dkt. No. 35 at 19-20.) However, Petitioner also "abandon[s]" this claim" in his traverse.   (Dkt. No. 69 at 1.)  In rejecting this claim, the Appellate Division determined:

> County Court thoroughly set forth its reasons for imposing a lengthy sentence, including the substantial quantities of oxycodone supplied by [Petitioner], the harm that [Petitioner's] conduct caused to the affected individuals and the community, [Petitioner's] lack of remorse or insight into the consequences of his actions and his extensive criminal history—which included convictions for a violent felony as well as numerous drug-related crimes.

*Major*, 143 A.D.3d at 1160.

When a petitioner's sentence is within the statutory range of the corresponding crime he was convicted of, no federal constitutional issue cognizable on habeas review is presented.  *See White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."); *see also Garrett v. Smith*, No. 05-CV-3374, 2006 WL 2265094, at *12 (E.D.N.Y. Aug. 8, 2006) ("It is well settled that an excessive sentence claim may not be raised as grounds for habeas corpus

relief if the sentence is within the range prescribed by state law.") (quoting *White*, 969 F.2d at 1383).

Here, Petitioner's sentence, as modified, of 20 years to life for operating as a major trafficker, 15 years for the first degree drug possession count, and 10 years for the third degree drug possession counts falls within the limits set by the New York State legislature, and thus Petitioner's excessive sentence claim provides no grounds for federal habeas relief.[14]  *See Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus."); *Rodriguez v. Griffin*, No. 16 Civ. 1037, 2018 WL 6505808, at *24 (N.D.N.Y. Dec. 11, 2018) (consecutive sentences for major trafficker conviction and drug sales "provides no grounds for federal habeas relief" even though maximum possible sentences were imposed).  Additionally, Petitioner has since "abandon[ed]" this claim as indicated in his traverse.  (Dkt. No. 69 at 1.)

In light of the foregoing, the Court recommends denying and dismissing ground five of the petition.

### F.    Ground Six: Prosecutorial Misconduct—Suppression of *Brady* Material

Petitioner argues, as he did in his 440.10 motion, that the prosecutor violated *Brady* by failing to disclose (1) the application for the warrants executed on December 20, 2011, at the homes of Vanier, Vollkommer, and Burns (the "Vanier SWA"); (2) the summaries of intercepted

---

[14]  In New York, the trial court was authorized to impose a maximum indeterminate life term with a minimum sentence of not less than 15 years nor more than 25 years for Petitioner's conviction for operating as a major trafficker.  (PL §§ 70.00(2)(a); 70.00(3)(a)(i); 70.71(5)(b).) The court was authorized to impose a determinate prison term of between 15 and 30 years for his first degree drug possession conviction and between 6 and 15 years for each of his third-degree drug convictions.  (PL §§ 70.71(4)(b)(i); 70.70(4)(b)(i).)

wiretap communications of Vanier, Vollkommer, and Burns, (the "wiretaps"); and (3) the "full cooperation agreement[s]" with Vanier, Vollkommer, Ramsell, and Szymanski.  (Dkt. No. 35 at 20-30.[15])

In denying Petitioner's 440.10 motion, the 440 court concluded that the prosecution had committed no misconduct.  (Dkt. No. 64-1 at 586-89.)  Noting that "[i]t is undisputed that the Otsego County District Attorney's Office was not involved in the investigation of Clarence Vanier, who was ultimately prosecuted by federal prosecutors," and that the Otsego DA's office was not the prosecutor's office that had presented the search warrant application for Vanier's home to a judge, the court concluded that the alleged *Brady* material "was not within the People's control nor was it exculpatory."  *Id*. at 587.

The court held Petitioner had failed to establish a *Rosario* violation, concluding that Petitioner had "failed to meet his burden in all aspects and, further, [that] his contentions are either not supported by any evidence or are squarely contradicted by the record evidence."  *Id*. The court concluded that all of Petitioner's remaining *Brady* and *Rosario* claims also were meritless.  *Id*.

With respect to Petitioner's newly-discovered evidence claim— excerpts of the wiretaps and Vanier SWA—the court concluded that "[t]he subject evidence is merely impeachment evidence and in light of the overwhelming evidence of [Petitioner's] guilt at trial, there is no basis to vacate the conviction based upon the newly discovered evidence."  *Id*. at 588.

---

[15]  Petitioner submitted to the 440 court the Vanier SWA (Dkt. No. 64-1 at 261-315) and the transcribed wiretaps (*id*. at 326-414).  The Vanier SWA contains summaries of some of the wiretapped communications.  *See id*. at 272-306.

Lastly, the court concluded that Petitioner's ineffective assistance of trial counsel claims lacked record support and "that in view of the totality of circumstances" Petitioner received the effective assistance of counsel. *Id*.

Petitioner filed a motion to renew his 440.10 motion based on his receipt of various police reports regarding the chain of custody of the CDs of the post-arrest interviews of Vollkommer and Burns and of the recordings of the wiretaps between Vanier, Vollkommer, and Burns. *Id*. at 590-605. Petitioner also provided the court with a NYSP incident report prepared by Investigator Hamilton relating to his investigation of Vanier, Vollkommer, and Burns, which, he contended, was "further undisclosed *Rosario* material which relates to the direct testimony of Inv. Hamilton." *Id*. at 595-96. Petitioner renewed the arguments made in his initial 440 motion, and responded to the People's opposition. *Id*. at 596-605. The district attorney filed an opposition asserting that the "new facts" Petitioner had submitted merely established that the recorded interviews and wiretap communications were in the custody of the NYSP, but that this failed to provide a basis for challenging the 440 court's decision. *Id*. at 651-52. Petitioner filed a reply to the People's opposition. *Id*. at 653-55.

In an August 6, 2018, decision and order, the 440 court concluded that even if Petitioner established through the newly-submitted documents that the prosecution had failed to disclose *Rosario* material, any such failure to disclose "did not contribute to the verdict." *Id*. at 656-57.

### 1.     The Vanier SWA and Wiretapped Communications

As noted above, Ramsell and Vanier operated independently of one another and were investigated by two separate agencies. During the investigation of Ramsell, OCSO worked in conjunction with several other agencies, but not the NYSP. OCSO Investigator Ten Eyck was, however, aware that NYSP had its own "parallel investigation," but the two agencies were not

working together.  (Dkt. No. 64-6 at 8-9.)  NYSP Investigator Hamilton, who led NYSP's investigation of Vanier, confirmed at trial that he did not communicate with OCSO Investigator Ten Eyck regarding Vanier's investigation.  (Dkt. No. 64-5 at 129; Dkt No. 64-6 at 87.)

The Otsego County District Attorney's Office, which prosecuted Petitioner, was involved in OCSO's investigation of Ramsell, but had no involvement in NYSP's investigation of Vanier and his drug operation.  As the Otsego DA explained at trial, "[t]here was no cooperation whatsoever between [the NYSP] and DEA Syracuse and Otsego County Sheriff's Department and DEA Albany. . . .  The investigation of Clarence Vanier was completely separate from the [Ramsell] investigation in Wells Bridge."  (Dkt. No. 64-4 at 102.)  The district attorney, in his opposition to Petitioner's 440.10 motion, also explained that his office was not involved in the NYSP's investigation or prosecution of Vanier and that Vanier was prosecuted federally, not by his office.  (Dkt. No. 64-1 at 574.)

OCSO Investigator Ten Eyck prepared the search warrant application for Ramsell's home at Wells Bridge.  NYSP Investigator Hamilton prepared the Vanier SWA.  During trial, defense counsel requested copies of both applications, noting that both Ten Eyck and Hamilton were witnesses at trial.  (Dkt. N. 64-2 at 93-102.)  The court ordered the district attorney to turn over the application for Ramsell's home (Wells Bridge).  (Dkt. No. 64-6 at 19.)  However, the court did not require the Vanier SWA to be turned over, but instead ordered the district attorney to obtain and review it for exculpatory material.  On October 16, 2012, after trial had begun, the district attorney received Hamilton's affidavit for the Vanier SWA, reviewed it, and informed the court and counsel that it contained no exculpatory information.  *Id*. at 113-14, 175-76.  The

district attorney also provided the affidavit to the court for its review, though the record does not appear to reflect anything with respect to the court's review of the affidavit.[16]

As part of NYSP's investigation of Vanier, Investigator Hamilton had obtained warrants to wiretap the phones of Vanier, Vollkommer, and Burns beginning in late September 2011. (Dkt. No. 64-1 at 270.)  Hamilton included summaries of some of the intercepted communications in his affidavit for the Vanier SWA.  *Id*. at 270-306.  The district attorney, in his opposition to Petitioner's 440.10 motion, stated he knew nothing about the existence of the wiretaps until he reviewed the Vanier SWA on October 16, 2012, and nothing that he read in the affidavit—including the summaries of the wiretaps—was exculpatory.  *Id*. at 575.

It is undisputed that the Vanier SWA and intercepted wiretapped communications in question was not disclosed prior to trial.  Petitioner states he received this material from Vollkommer in May of 2017.  (Dkt. No. 35 at 22.)  Petitioner claims "[t]he suppressed evidence contains dates and times of transactions between Vanier and his true supplier, as well as transactions between Vanier and Vollkommer.  Hence the failure of the prosecution to turn over this crucial information allowed the perjured testimony of Clarence Vanier and his associates to go unchecked.  Petitioner was subsequently prejudiced by the non-disclosure of this material by the prosecution."  *Id*.

---

[16]  The transcript reads, in relevant part:

> THE COURT:  Mr. Muehl, you can hand that up, though, just so that the record's clear that there's been an independent examination for any Brady material.
> Mr. MUEHL:  And if you decide.
> THE COURT:  If there is, I'll order it disclosed.
> MR. MUEHL:  If you decide for whatever reasons to disclose, I'll turn it over.

(Dkt. No. 64-6 at 176.)

Respondent argues the 440 court's denial of Petitioner's prosecutorial misconduct claim did not incorrectly apply Supreme Court precedent because the Vanier SWA contained no exculpatory evidence, the wiretap communications were not in the Otsego DA's possession, and did not, in any event, contain information that had to be disclosed under *Brady*. (Dkt. No. 62 at 40-60.)

Prosecutors must disclose to an accused exculpatory information in their possession that is favorable to the defense and material to guilt or punishment, *Brady*, 373 U.S. at 87, and evidence affecting the credibility of a witness, where the reliability of the witness could determine guilt or innocence, *Giglio v. United States*, 405 U.S. 150, 154 (1972). Such evidence is "material," and thus must be disclosed, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

A *Brady* violation consists of three factors: (1) "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory or impeaching"; (2) "that evidence must have been suppressed by the State, either willfully or inadvertently"; and (3) "prejudice must have ensued." *Simpson v. United States*, 693 F. App'x 33, 34 (2d Cir. 2017) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Here, Petitioner contends these documents "contain[ ] dates and times of transactions between Vanier and his true supplier, as well as transactions between Vanier and Vollkommer." (Dkt. No. 35 at 23.) Petitioner argues that with this information, he would have been able to establish "that on all the dates those transactions were being conducted between Vanier and his drug supplier, and Vanier and Vollkommer, [Petitioner] was no where in the vicinity prior to,

during, or after the exchanges." *Id*.  However, as the 440 court reasonably found neither the

Vanier SWA nor the wiretaps were subject to disclosure under *Brady*, and, with respect to the

wiretaps, the Otsego DA had neither actual nor constructive possession of them and, therefore,

the district attorney did not fail in his disclosure obligation.  (*See* Dkt. No. 62 at 43-48.)

First, none of the wiretap summaries contained in the Vanier SWA reveals transactions

between Vanier and any oxycodone supplier, let alone an oxycodone supplier other than

Petitioner.[17]  Indeed, as Petitioner states, the bulk of wiretaps were between Vanier and

Vollkommer, primarily discussing arrangements for Vollkommer to drop off money to Vanier to

obtain a new supply of drugs.  Although Petitioner contends that he was "out of town" when the

transactions discussed took place, as Respondent points outs, that did not preclude Petitioner

from having supplied Vanier before he "left town."

Second, as set forth above, the evidence at trial demonstrated that Petitioner was not

involved in the day-to-day movement of the oxycodone once he had supplied Vanier and he

intentionally created a buffer before between himself and the day to day operations to insulate

himself from criminal liability.  Simply put, the summaries and the transcribed wiretap

---

[17]  As to the summary of the December 5, 2011, call between Vanier and his wife Melody, during which Vanier was in New York City purchasing drugs from a "new supplier" it was reasonable to assume Vanier was purchasing cocaine, not oxycodone, from this suppler.  (Dkt. No. 64-1 at 302.)  On two previous wiretap summaries it was indicated Vanier would travel to New York City to purchase cocaine for Vollkommer.  *See id*. at 284-85, 288.  As Respondent points out, even had the December 5, 2011, wiretap summary been disclosed, it likely would not have helped Petitioner.  According to Petitioner's own "alibi records," he appears to have been in New York City at exactly the same time as Vanier.  A review of Petitioner's CapitalOne credit card statement, reflects a charge of $782.65 on December 4, 2011, for a one night stay at the W Hotel in Times Square, departing on December 5, 2011.  (*See* Dkt. No. 64-1 at 943.)  The cell phone records he submitted also reflect a one-night stay in New York City at this time.  *Id*. at 447.  Further, given Vanier's testimony that he was from Brooklyn, and went to Brooklyn to pick up cocaine, (Dkt. No. 64-7 at 151), and his testimony that he and Petitioner "went down and picked up a whole lot," of cocaine, *id*. at 153-54,  the jury reasonably could have concluded that the two were together during a drug-buying trip.

summaries provided no proof that someone other than Petitioner was Vanier's source of oxycodone.[18]

Third, the conduct underlying the major trafficking charge occurred over a six-month period, and the trial evidence never established on what particular dates Petitioner supplied Vanier with oxycodone, except for the last time that occurred a "[c]ouple hours" before Vanier's house was searched.[19]  As the district attorney was not aware of Petitioner's "out of town" travel schedule during the relevant time, the summaries in the Vanier SWA would not have been deemed exculpatory.  In any event, the records Petitioner submitted to the 440 court concerning his travels fail to establish that he could not have supplied Vanier with oxycodone.  As Respondent accurately summarizes, portions of the records reflect that Petitioner was within driving distance of Vanier's home when he claims to have been away.  (*Compare* Dkt. No. 32 at 24-26 *with* Dkt. No. 62 at 46-49.)

In sum, even if the district attorney had known about Petitioner's alleged alibi—and there is no evidence that he did—nothing in the Vanier SWA would have been exculpatory in light of the alibi evidence.  Thus, there is no indication that Petitioner was prejudiced as a result of his failure to obtain the material at issue.

---

[18]  While Petitioner highlights certain transcribed wiretaps to support his *Brady* claims, specifically a conversation between Vanier and Vollkommer on October 18, 2011, and communications between Vanier and Vollkommer on December 17-18, 2011, the Court agrees with Respondent that when the summaries of the calls are viewed in their entirety, they do not contain materially exculpatory information.  (Dkt. No. 35 at 25-26; Dkt. No. 62 at 54-58.)  In fact, the calls could be read to inculpate, rather than exculpate, Petitioner.  *See id*. at 62 at 56.

[19]  The last summary of the wiretaps contained in the Vanier SWA took place on December 14, 2011, and the last transcribed intercepted communications presented to the state court occurred on December 19, 2011, at 08:05:11.  (Dkt. No. 64-1 at 306, 414.)  Thus, there is no exculpatory evidence related to the evening of December 19, or early hours of December 20, 2011, when Vanier testified Petitioner supplied the approximate 300 grams of oxycodone a "[c]ouple hours" before the warrant was executed.  (Dkt. No. 64-7 at 131.)

Nor has Petitioner established the materiality of the undisclosed information. The standard for materiality is not whether the undisclosed information might in some way have been helpful for the defense. *United States v. Agurs*, 427 U.S. 97, 112 n.20 (1976). *Brady's* materiality standard is meant to "ensure that a miscarriage of justice does not occur." *Bagley*, 473 U.S. at 675; *see United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (the "essential purpose" of *Brady* is to "ensur[e] the reliability of [a] criminal verdict"). Thus, consistent with *Brady's* focus on the reliability of verdicts, a prosecutor's failure to turn over exculpatory or impeachment evidence is a *Brady* violation rising to the level of constitutional error only when this failure "undermine[s] confidence in the outcome" of the trial. *Bagley*, 473 U.S. at 682; *see also Kyles v. Whitley*, 514 U.S. 419, 434 (citing *Bagley*, 473 U.S. at 678) (vacatur required where verdict is not "worthy of confidence"). Even if the undisclosed information contained some information that might have been helpful to the defense, the failure to disclose it would not have violated *Brady* if it did not impact the outcome of trial. *Bagley*, 473 U.S. at 675 n.7.

First, the non-disclosure of the Vanier SWA does not undermine confidence in the jury's verdict on the major trafficking charge. As discussed, the trial evidence established that Petitioner regularly supplied Vanier and Ramsell with large quantities of oxycodone, and that the total proceeds from these transfers during the charged period easily exceeded $75,000. Nothing in the wiretap summaries casts any doubt on Vanier's testimony that Petitioner regularly supplied him with oxycodone, in the large quantities to which he testified. Instead, the wiretaps support the prosecution's evidence that Vanier received large quantities of oxycodone, that he would give it to Vollkommer, and Vollkommer would sell it to others before giving Vanier the proceeds. Moreover, none of the undisclosed wiretap summaries has any relevance to the

overwhelming evidence regarding Petitioner's sale of oxycodone to Ramsell. Thus, Petitioner's convictions for Counts One, Three, and Four were supported by sufficient evidence.

Second, and as the 440 court found, the Otsego DA never had possession of the NYSP wiretaps of Vanier, Vollkommer, and Burns, and had no knowledge they existed until reading the summaries in the Vanier SWA during trial. That finding of fact is entitled to deference, which Petitioner fails to rebut by clear and convincing evidence. *See* § 2254(e)(1). To be sure, under certain circumstances a prosecutor's disclosure duty under *Brady* applies to evidence not in the prosecutor's actual possession. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). However, "the propriety of imputing knowledge to the prosecution is determined by examining the specific circumstances of the person alleged to be an 'arm of the prosecutor.'" *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006) (citing *United States v. Morrell*, 524 F.2d 550, 555 (2d Cir. 1975)).

Here, the trial evidence established that the NYSP investigation of Vanier was independent of the Otsego DA's office prosecution of Petitioner and NYSP Investigator Hamilton was not an "arm" of the prosecutor. And because the Otsego DA's investigation of Christine Ramsell was entirely separate from the NYSP investigation of Vanier, Vollkommer, and Burns, the Court agrees with Respondent that the knowledge NYSP had of the existence and contents of the wiretaps cannot be imputed to the Otsego DA's office. (*See* Dkt. No. 62 at 51-54.) In any event, as set forth above, the disclosure of the wiretaps was not required under *Brady*.

Third, as set forth above, the 440 court determined "[t]he subject evidence is merely impeachment evidence and in light of the overwhelming evidence of [Petitioner's] guilt at trial,

there is no basis to vacate the conviction based upon the newly discovered evidence." (Dkt. No. 64-1 at 588.) As discussed, "[w]ith impeachment evidence, where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *James*, 603 F. Supp. 2d at 485 (quotation marks and citation omitted); *see also United States v. Santos*, 486 F. App'x 133, 135-36 (2d Cir. 2012) (citing *United States v. Jackson*, 345 F.3d 59, 74 (2d Cir. 2003) ("[A] new trial is generally not required . . . when the suppressed impeachment evidence merely furnished an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.")); *Mack v. Conway*, 476 F. App'x 873, 876 (2d Cir. 2012) (quoting *United States v. Wong*, 78 F.3d 73, 79 (2d Cir. 1996) (internal quotations marks omitted)). When undisclosed impeachment evidence is "possibly useful to the defense," but "not likely to have changed the verdict," the undisclosed impeachment evidence is "not material in the *Brady* sense." *Blalock v. Smith*, No. 08 CIV. 7528, 2012 WL 3283439, at *11 (S.D.N.Y. Aug. 13, 2012) (quoting *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (quoting *Giglio*, 405 U.S. at 154 ) (quotation marks omitted)). In this case, the jury was aware of the credibility of Vanier, Vollkommer, and Burns, all of whom were being prosecuted federally.

Lastly, Petitioner further claims that had the Otsego DA disclosed the wiretaps he could have provided an alibi to prove that he could not have dropped off the 300 grams of oxycodone police found at Vanier's house. (Dkt. No 35 at 26-27.) However, the wiretap summaries do not reveal when Petitioner dropped off the oxycodone on December 19, 2011; Vanier's testified to this, and therefore, Petitioner could have presented his alibi defense upon hearing this testimony.

Thus, the undisclosed information would not have impacted the outcome of Petitioner's conviction for Count Two.

Based on the foregoing, Petitioner has failed to show that the district attorney violated *Brady* in failing to turn over the Vanier SWA or transcribed wiretap summaries.

### 2. Cooperation agreements

Petitioner additionally argues that the prosecution failed to disclose the "full" cooperation agreements of Vanier, Vollkommer, Russell, and Szymanski. (Dkt. No. 35 at 27-30.) In its discussion of Petitioner's prosecutorial misconduct claims, the 440 court "examined the remaining arguments as they relate to *Brady* and *Rosario* and likewise find them to be without merit." (Dkt. No. 64-1 at 587.) Thus, the AEDPA deference applies. *See Aparicio v. Artuz*, 269 F. 3d 78, 94 (2d Cir. 2001); *accord Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Before trial, the district attorney disclosed in an October 5, 2012, letter to the defense all of the agreements made with prosecution witnesses in return for their truthful testimony. (Dkt. No. 64-1 at 578, 584-85; Dkt. No. 64-2 at 96-97.) Relevant to this claim, the district attorney stated that Vanier "received a seven year sentence in his federal prosecution. I agreed not to prosecute the state possession charges in exchange for his cooperation." (Dkt. No. 64-1 at 584.) The district attorney's letter made no mention of any agreement with Ramsell, Vollkommer, or Szymanski. *See id.* at 584-85. Ramsell, Vollkommer, and Szymanski all testified they were receiving nothing from the district attorney in return for their testimony.

With respect to Ramsell, she testified that although the district attorney originally had made an offer of six months in a drug treatment facility in return for her cooperation, this offer was revoked, after her grand jury testimony but before trial, and no new offer was made after she committed new crimes following her arrest.  (Dkt. No. 64-6 at 405-06; Dkt. No. 64-1 at 578-79.)  Here, Petitioner surmises that she must have received a "secret" agreement because she ultimately received no jail time when she was sentenced for her crimes, which was "a better deal than what had been stated with the original cooperation agreement."  *Id*.  (Dkt. No. 35 at 29.)

Vollkommer testified that he had pled guilty in federal court and was expecting a sentence ranging from seven-and-a half to twenty years.  As part of his plea agreement, he was required to testify at Petitioner's trial.  Vollkommer further stated that the Otsego County district attorney had made him no offer in return for his cooperation.  (Dkt. No. 64-7 at 193, 204-05.)  However, Petitioner claims to have learned after trial from Vollkommer himself that the Delaware County district attorney agreed not to prosecute Vollkommer for an overdose death that occurred in Vollkommer's home in 2011, which was never charged, "contingent on Vollkommer's cooperation with the Federal authorities and this included testifying against" Petitioner.  (Dkt. No. 35 at 27.)  According to Petitioner, "[t]he promise of not being charged with the overdose death that occurred at his home gave Vollkommer a powerful incentive to give less than truthful testimony regarding [Petitioner]."  *Id*.  Ultimately, Vollkommer received a three year term of probation and six months of weekend Intermittent Confinement.  *Id*. at 28.

When Szymanski testified at Petitioner's trial, he had pled guilty to aggravated unlicensed operation of a motor vehicle, which was pending sentencing.  He was expecting a sentence of from one and one third to four years.  He also testified that the district attorney had made him no promise in return for his cooperation.  (Dkt. No. 64-8 at 135, 142.)  Petitioner

claims a secret agreement existed despite this testimony because after trial Szymanski was sentenced to one year, not the minimum of one and one third.  (Dkt. No. 35 at 29.)

As to Vanier, Petitioner claims the district attorney failed to reveal "the full scope" of Vanier's cooperation agreement.  *Id*. at 28.  He further claims Vanier ultimately received a five-year sentence in federal court and, as part of his cooperation against Petitioner, state charges were dropped "against both Vanier and his wife."  *Id*.  He also claims the district attorney failed to correct Vanier's "false and misleading" testimony concerning his cooperation agreement.  *Id*.

In his opposition to Petitioner's 440 motion, the district attorney confirmed that he had offered Ramsell, Vollkommer, and Szymanski nothing in exchange for their testimony.  (Dkt. No. 64-1 at 578.)  The district attorney confirmed that Ramsell had originally been promised a six-month treatment in return for her testimony, but the offer was withdrawn.  The district attorney noted Ramsell's conviction subsequently was reduced to a lesser charge after she completed a judicial diversion program in 2014, but stated that this had nothing to do with Ramsell's 2012 trial testimony.  *Id*. at 578-79.  As to Vollkommer, the district attorney stated he was not aware of any agreement that Vollkommer may have made with the Delaware County District Attorney's Office.  *Id*. at 578.  With respect to Szymanski, the district attorney stated that Szymanski's attorney after trial asked for a recommendation of a sentence of one year, and the district attorney agreed, but no such consideration had been offered prior to trial.  *Id*.

With regard to Vanier, the district attorney stated it was his understanding that, after being advised by Vanier's federal court attorney, Vanier had entered a guilty plea and was going to receive a seven-year sentence of imprisonment.  Based on that fact and his cooperation, the district attorney dismissed the charges pending against him in Oneonta Town Court.  After Petitioner's conviction and at the request of Vanier's federal attorney, the district attorney

provided an affidavit that outlined Vanier's cooperation, which was presented in federal court as part of a request for a lesser sentence.  The district attorney was not asked for the affidavit until after Petitioner had been convicted.  As to Vanier's wife Melody, the district attorney stated he had never intended to prosecute her (because he had no evidence of his wife's involvement in the drug trade).  *Id*. at 578.

As discussed above, "[t]o establish a *Brady* violation, a petitioner must show that (1) the undisclosed evidence was favorable to him; (2) the evidence was in the state's possession and was suppressed, even if inadvertently; and (3) the defendant was prejudiced as a result of the failure to disclose."  *Mack*, 476 F. App'x at 876 (citing *Strickler*, 527 U.S. at 281-82).  As noted, the 440 court denied this claim, which the Court finds involved no unreasonable determination of the facts, and was neither contrary to, nor an unreasonable application of, Supreme Court precedent.  (Dkt. No. 64-1 at 587.)

Here, Petitioner has failed to establish that any undisclosed cooperation agreements with Vanier, Vollkommer, Ramsell, or Szymanski existed.[20]  There can be no *Brady* violation for failure to disclose evidence that does not exist.  *See Mallet v. Miller*, 432 F. Supp. 2d 366, 377

---

[20]  Petitioner also claims the district attorney did not disclose documents filed in Vanier's federal case relating to Vanier's agreement.  (Dkt. No. 35 at 28.)  However, the district attorney was not involved in the federal prosecution of Vanier and, in any event, it appears the plea agreement at issue was filed on the docket on April 26, 2012, and thus publicly available.  *See United States v. Vanier*, No. 3:12-cr-00210 (TJM), ECF Dkt. No. 3.  "If the defendant has information but fails to use due diligence to make use of it, the defendant cannot later claim that the government 'suppressed' evidence."  *Hill v. West*, 599 F. Supp. 2d 371, 390 (W.D.N.Y. 2009) (citing *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982)).  According to Vanier's plea agreement, he admitted to distributing 800 grams of oxycodone and 180 grams of cocaine with "co-conspirators with initials JV, DM, and others" between January and December 2011.  *See United States v. Vanier*, No. 3:12-cr-00210 (TJM), ECF Dkt. Nos. 2, 4.  To the extent Petitioner objects that defense was not made aware of the district attorney's post-trial memorandum submitted to the federal court regarding Vanier's cooperation at Petitioner's trial, the memorandum did not exist at the time, and, consequently was not suppressed under *Brady*.

(S.D.N.Y. 2006) ("[T]he mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief.").  Further, the Second Circuit held that the fact that a witness received a benefit, such as a reduced sentence, does not establish that prior to the defendant's trial, the prosecutor had promised leniency to the witness.  *See Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003); *see also Breedlove v. Berbary*, No. 09-CV-6297, 2011 WL 3439261, at *4 (W.D.N.Y. Aug. 5, 2011) (finding the petitioner's sole basis for his belief in the existence of such agreements was that shortly after petitioner was convicted, the two witnesses were released from jail speculative and insufficient to overcome the presumption of correctness accorded to the state court's ruling that no cooperation existed).  Petitioner thus fails to sustain his burden of proof to show that exculpatory material existed and was withheld at the time of trial.  *See, e.g.*, *Chandras v. McGinnis*, No. 01 Civ. 2519, 2002 WL 31946711, at *5 (E.D.N.Y. Nov. 13, 2002) ("[T]here must be some evidence of an agreement or understanding between [the prosecutor] and [the witness] for a *Giglio* violation to have occurred.  In the absence of credible evidence contradicting the [prosecutor's] denials, [the defendant's] claims of prosecutorial misconduct are meritless."); *Gonzalez v. Bennett*, No. 03 Civ. 1444, 2007 WL 2982219, at *2 (S.D.N.Y. Oct. 10, 2007) (dismissing the petitioner's *Brady* claim because he failed to show "that a cooperation agreement ever existed between the prosecution and its witness").

Further, Petitioner has not established that any allegedly undisclosed cooperation agreement would have been material within the meaning of *Brady*.  The Supreme Court has held that "there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.  As discussed, in order to establish materiality, Petitioner must show that the evidence could "reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict." *Shabazz*, 336 F.3d at 162 (citations and quotation marks omitted).  Additionally, "[w]ith impeachment evidence, 'where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material.'" *James v. United States*, 603 F. Supp. 2d 472, 485 (E.D.N.Y. 2009) (quoting *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998)).

Here, defense counsel cross-examined each of these witnesses about their agreements— or lack thereof—and Petitioner has failed to show that any additional undisclosed consideration existed and that it would have impacted the outcome of the trial.  As noted, the credibility of Vanier, Ramsell, Vollkommer, and Szymanski was subject to attack through vigorous cross-examination and despite any confusion or "misleading" statements about Vanier's plea agreement, including any undisclosed benefits his wife received, the jury was well aware that he was facing a great deal of jail time in federal court and that he hoped to get a sentence of only seven years.  The jury was well aware that Vanier might have an incentive to curry favor with the district attorney in order to help himself out in the federal case.  *See Hemphill v. Senkowski*, No. 02 CIV. 7093, 2004 WL 943567, at *12 (S.D.N.Y. May 3, 2004) (failing to disclose cooperation agreement is "only reversible errors if it undermines the confidence in the outcome of the trial").  In sum, Petitioner has failed to establish that the prosecutor failed to disclose the "full cooperation" agreements at issue in violation of *Brady*.

Thus, in light of the foregoing, the 440 court's rejection of Petitioner's claim was not contrary to *Brady*.  Accordingly, the Court recommends denying and dismissing ground six of the petition.

G.     **Ground Seven: Prosecutorial Misconduct—Failure to Preserve** *Brady* **Material**

Petitioner also argues, as he did in his supplemental 440.10 motion,[21] that the prosecutor committed misconduct by failing to provide to the defense tape recordings of Vollkommer and Burns that the NYSP made of interviews conducted with the U.S. Attorney's Office on December 20, 2011, and then allowed the tapes to be destroyed after trial.  (Dkt. No. 35 at 30-33.)  Although the 440 court did not mention this aspect of Petitioner's *Brady* claim, (Dkt. No. 64-1 at 587), as set forth above, the 440 court's decision nevertheless constitutes an adjudication on the merits and the AEDPA deference applies.  *See Aparicio*, 269 F. 3d at 94.

As discussed, to establish a *Brady* claim, the petitioner must satisfy three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued."  *Strickler*, 527 U.S. at 281-82.

Here, Petitioner has provided no evidence that the recordings were in fact exculpatory or that they would impeach the testimony of Vollkommer or Burns.  As Respondent points out, Petitioner himself states that he "can only speculate as to the exculpatory and impeaching nature of the statements contained therein . . . ."  (Dkt. No. 62 at 67, quoting Dkt. No. 35 at 31.)  However, a habeas petitioner's "mere speculation that exculpatory evidence was withheld is insufficient to warrant habeas relief."  *Mallet*, 432 F. Supp. 2d at 377; *see also Bell v. Napoli*,

---

[21]  Specifically, Petitioner argued "the prosecution committed misconduct when it allowed *Brady/Rosario* material to be destroyed by New York State Police[]."  (Dkt. No. 64-1 at 559-64.)  The Court notes *Rosario* claims are state law claims, not founded on either the federal constitution or federal laws, and therefore, are not cognizable in a federal habeas proceeding.  *See Young v. McGinnis*, 411 F. Supp. 2d 278, 329 (E.D.N.Y. 2006); *Randolph v. Warden, Clinton Corr. Facility*, No. 04 CIV. 6126, 2005 WL 2861606, at *5 (S.D.N.Y. Nov. 1, 2005) ("the failure to turn over *Rosario* material is not a basis for habeas relief as the *Rosario* rule is purely one of state law").

No. 08-CV-9900, 2010 WL 8039333, at *21 (S.D.N.Y. Aug. 24, 2010) (rejecting *Brady* claim

based on unproduced surveillance tape as unduly speculative where the petitioner never saw the

surveillance tape at issue and could only speculate about what it showed), *report and*

*recommendation adopted*, 2011 WL 6097729 (S.D.N.Y. Dec. 7, 2011).

Nor has Petitioner demonstrated prejudice to the non-disclosure or failure to preserve

them post trial.  Even if defense counsel had been able to impeach Vollkommer and Burns with

prior statements made on the date of their arrest, there is no reasonable probability of a different

verdict given the testimony of Vanier and Ramsell and the other corroborating evidence.

Moreover, "where the undisclosed evidence merely furnishes an additional basis on which to

challenge a witness whose credibility has already been shown to be questionable or who is

subject to extensive attack by reason of other evidence, the undisclosed evidence may be

cumulative, and hence not material."  *James*, 603 F. Supp. 2d 472, 485 (E.D.N.Y. 2009).

Thus, the 440 court's denial of this claim was not an unreasonable application of clearly

established law.

To the extent Petitioner argues a destruction of evidence claim as a violation of due

process apart from the *Brady* claim, that claim must also fail.  (Dkt. No. 69 at 28-31.)  Such a

claim requires the showing of bad faith from the government.  *See United States v. Tyree*, 279 F.

App'x 31, 33 (2d Cir. 2008) (citing *Arizona v. Youngblood*, 488 U.S. 51, 56-68 (1988);

*California v. Trombetta*, 467 U.S. 479, 489  (1984)).  Here, the record does not support the

conclusion that the NYSP "acted in bad faith" in destroying the evidence.  Rather, the tapes were

destroyed two years after Petitioner's trial, after the two witnesses had been sentenced in their

federal cases.  (*See* Dkt. No. 62 at 68-70.)  Contrary to Petitioner's contention that the "only

logical conclusion" is that the "state suppressed these recording[s] and allowed them to be

destroyed because they were favorable to his defense" such claim is speculative and unsupported by the record before the state court. Thus, the alleged post-trial destruction does not rise to the level of a due process violation. *See Licausi v. Griffin*, 460 F. Supp. 3d 242, 265 (E.D.N.Y. 2020).

Lastly, Petitioner makes a cursory argument that "the destruction of this evidence has effectively stripped [Petitioner] of his right to confront adverse witnesses" in violation of the Confrontation Clause. (Dkt. No. 35 at 31.) However, "because the recordings were never introduced at trial, [Petitioner's] asserted violation of his confrontation clause claim due to their destruction is baseless." *Margengo v. Conway*, 342 F. Supp. 2d 222, 223 n.5 (S.D.N.Y. 2004). Thus, this claim fares no better.

Based on the foregoing, the 440 court's decision denying this claim was not "beyond the possibility of fairminded disagreement." *Richter*, 562 U.S. at 102. Accordingly, the Court recommends denying and dismissing ground seven of the petition.

### H.     Ground Eight: Prosecutorial Misconduct—False Testimony

Petitioner also contends, as he did in his 440.10 motion, that the prosecutor "knowingly allowed a key prosecution witness to testify falsely, when it knew the testimony to be false, and failed to correct" and thus was deprived of his due process rights to a fair trial. (Dkt. No. 35 at 33-36.) Construed liberally, Plaintiff claims the prosecutor committed misconduct by allegedly permitting Vanier to testify falsely in the grand jury and failed to correct the perjury, proceeding to trial on an indictment that was defective due to the allegedly perjured testimony, and,

thereafter allowing Vanier to testify falsely at trial.  *Id.*[22]  The Court finds Petitioner's claims do not warrant habeas relief.

In the first instance, to the extent Petitioner is challenging the propriety of the grand jury proceeding, including the prosecutor obtaining and proceeding on a "defective indictment", that claim fails.  There is no federal constitutional right to a grand jury proceeding.  *See Alexander v. Louisiana*, 405 U.S. 625, 633 (1972); *LanFranco v. Murray*, 313 F.3d 112, 118 (2d Cir. 2002).  In New York, a grand jury indictment arises from the "State Constitution and other state laws . . . and federal habeas relief may not be granted for violations of state law."  *Robinson v. LaClair*, No. 09-CV-3501, 2011 WL 115490, at *8 (E.D.N.Y. Jan. 13, 2011).  Therefore, "[c]laims of deficiencies in state grand jury proceedings are not cognizable in a habeas corpus proceeding in federal court."  *Davis v. Mantello*, 42 F. App'x 488, 490-91 (2d Cir. 2002) (summary order) *cert. denied sub nom Davis v. Filion*, 538 U.S. 986 (2003); *see also Van Stuyvesant v. Conway*, No. 03 Civ. 3856, 2007 WL 2584775, at *25 (S.D.N.Y. Sept. 7, 2007) (claim that false testimony was presented before the grand jury is not cognizable on habeas review) (citing *Lopez v. Riley*, 865 F.2d 30, 32-33 (2d Cir. 1989)); *Mayes v. Donnelly*, No. 03-CV-417, 2009 WL 2601106, at *9 (W.D.N.Y. Aug. 21, 2009) ("To the extent that Mayes is attempting to assert a claim that Anderson perjured himself when he testified before the grand jury, habeas relief is not warranted because the claim is not cognizable in this federal habeas proceeding[.]").

Further, following a guilty verdict rendered by a petit jury, alleged deficiencies in a state grand jury proceeding are not cognizable on habeas review.  *See Lopez v. Riley*, 865 F.2d 30, 31 (2d Cir. 1989); *Dunn v. Sears*, 561 F. Supp. 2d 444, 453 (S.D.N.Y. 2008).  Thus, after a

---

[22]  Petitioner also reiterates his claims that the prosecution engaged in "misconduct" by withholding crucial *Brady/Rosario* material, discussed above, *see* Point IV.F.  (Dkt. No. 35 at 33-35.)

conviction, habeas relief is unavailable for claims of prosecutorial misconduct in the grand jury. *See Campbell v. Poole*, 555 F. Supp. 2d 345, 367-68 (W.D.N.Y. 2008); *Evans v. Poole*, No. 05 Civ. 5951, 2005 WL 2847769, at *1 (S.D.N.Y. Oct. 31, 2005).

Next, Petitioner contends Vanier testified falsely in the grand jury and at trial by presenting himself as a "middleman" in the drug operation between Petitioner and Vollkommer, and that the Petitioner owned the oxycodone found at Vanier's home on December 20, 2011. (Dkt. No. 35 at 33-35.)  Petitioner bases his perjury claim on the wiretap summaries included in the Vanier SWA, the transcribed transcripts, and "physical evidence," which he asserts contradicts Vanier's testimony and the prosecutor withheld in violation of *Brady*/*Rosario*. *Id.* Although the 440 court did not directly address this aspect of Petitioner's misconduct in its decision, the court stated that it had "examined [Petitioner's] remaining arguments as they relate to *Brady* and *Rosario* and likewise find them to be without merit." (Dkt. No. 64-1 at 587.)  The 440 court reasonably concluded that the prosecutor committed no misconduct.

"Perjury is committed when a witness 'gives false testimony concerning a material matter with the willful intent to provide false testimony.'" *Velazquez v. Poole*, 614 F. Supp. 2d 284, 333 (E.D.N.Y. 2007) (quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001)). "To establish prosecutorial misconduct premised upon the presentation of perjury, [petitioner] must first establish that perjury was committed; i.e. that the testimony was 'actually, and intentionally, false.'" *Gibson v. Artus*, No. 04-CV-820 (LEK), 2008 WL 9434482, at *14 (N.D.N.Y. Mar. 21, 2008) (alternation in original) (collecting cases), *aff'd*, 407 F. App'x 517 (2d Cir. 2010).  A petitioner "must also establish that 'the prosecution knew, or should have known, of the perjury," and "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (citations omitted).  Thus, under a due process analysis, a

conviction must be set aside where "(1) 'the prosecution knew, or should have known, of the perjury,' and (2) 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959))).

Here, Petitioner has neither established that Vanier's testimony was actually and intentionally false nor that the prosecution knew or had reason to know that Vanier was allegedly committing perjury.  First, as pointed out by Respondent and as detailed above, the record demonstrates the prosecutor did not know about and had not seen the complete wiretap transcriptions at the time of trial.  Thus, to the extent that materially conflicted in any way with Vanier's testimony, if any, the prosecutor would not have known about it, and, therefore, the prosecution did not knowingly present false testimony.  (Dkt. No. at 62 at 72-73.)

With respect to the wiretap summaries contained in the Vanier SWA, which the prosecutor received via facsimile mid-trial and turned over to the court, Petitioner has not established that Vanier committed perjury based on their content.  *Id.*

Finally, Petitioner's contention that "physical surveillance" by law enforcement "directly contradicted the testimony" of Vanier regarding Petitioner having supplied him with oxycodone lacks any support.  (Dkt. No. 35 at 34-35.)  Petitioner's theory appears to be that law enforcement was constantly watching Vanier's home, and yet never saw Petitioner there, so, therefore, Vanier lied about Petitioner coming to his house and dropping off oxycodone.  *Id.*  The Court agrees with Respondent that this premise is false.  (Dkt. No. 62 at 72-73.)

No evidence at trial suggested that Vanier's home was under regular surveillance and Vanier testified that Petitioner periodically came to his house to drop off oxycodone and to

collect money.  Contrary to Petitioner's assertion, evidence that no law enforcement officer happened to see Petitioner at Vanier's home does not establish that Petitioner did not go to Vanier's home.  Further, Kate Joslyn testified she went with Petitioner to Vanier's house between five and ten times during the relevant time period.  (Dkt. No. 64-7 at 235.)

At most, Petitioner's claim is simply an attack on the witness's credibility, but this Court must defer to the jury's credibility findings concerning Vanier's testimony.  *See Bellezza v. Fischer*, No. 01-CV-1445, 2003 WL 21854749, at *15 (E.D.N.Y. Aug. 6, 2003) (holding that, on collateral review, a federal habeas court "must presume that the jury resolved any questions of credibility in favor of the prosecution") (internal quotation marks and citation omitted).

For all these reasons, Petitioner cannot sustain a claim that the prosecutor knowingly presented false testimony to the grand jury or at trial.  This Court finds Petitioner's claim that the prosecutor engaged in misconduct by offering Vanier's testimony is without merit.  Accordingly, the Court recommends denying and dismissing ground eight of the petition.

## I.      Ground Nine: Newly-Discovered Evidence

Petitioner contends that "there is newly discovered evidence, which if produced at trial, would have produced a different outcome in the proceedings."  (Dkt. No. 35 at 36-38.) Specifically, Petitioner claims:

> There can be no mistake that the evidence describing the conduct of Clarence Vanier and his associates, as documented in the intercepted communications [Exhibit B] and the warrant application [Exhibit A] would lead to a different outcome in a new trial.  The dates and times of transactions alone would be enough for [Petitioner] to show that he could not have been involved in Mr. Vanier's drug operation.  Mr. Vanier would not have been able to mislead the jury as to his culpability regarding his drug operation by placing the blame on [Petitioner].  Records indicate that Mr. Vanier and Mr. Vollkommer met with each other to fabricate a story by which they could lessen their potential prison

> sentences.  However, in light of this new evidence their story
> simply will not hold up.

*Id*. at 37.

Habeas relief is available on the ground of newly discovered evidence only if the evidence bears on the constitutionality of the petitioner's conviction.  *Townsend v. Sain*, 372 U.S. 293, 317 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *accord Herrera v. Collins*, 506 U.S. 390, 400 (1993).  Newly discovered evidence that goes only to the petitioner's guilt or innocence is not sufficient to grant habeas relief.  *Herrera v. Collins*, 506 U.S. at 400; *Chandler v. Girdich*, No. 04-CV-432, 2007 WL 1521128, at *3-4 (W.D.N.Y. Apr. 25, 2007).  A federal habeas court is not "permit[ted] . . . to make its own subjective determination of guilt or innocence."  *Jackson v. Virginia*, 443 U.S. 307, 319 n.13 (1979).

Petitioner raised his claim of newly discovered evidence in his supplemental 440.10 motion to vacate his conviction (Dkt. No. 64-1 at 212), which provides that a conviction may be vacated if:

> New evidence has been discovered since the entry of a judgment
> based upon a verdict of guilty at trial, which could not have been
> produced by the defendant at the trial even with due diligence on
> his part and which is of such character as to create a probability
> that had such evidence been received at the trial the verdict would
> have been more favorable to the defendant; provided that a motion
> based on such ground must be made with due diligence after the
> discovery of such alleged new evidence.

N.Y. Crim. Proc. Law § 440.10(1)(g).  In rejecting this claim, the 440 court determined "[t]he subject evidence is merely impeachment evidence and in light of the overwhelming evidence of defendant's guilt at trial, there is no basis to vacate the conviction based upon the newly discovered evidence."  (Dkt. No. 64-1 at 588.)  Further, as discussed above, the court adhered to

that ruling its decision on Petitioner's motion to renew: "The court finds that the non-disclosure, even if established, did not contribute to the verdict." *Id*. at 657.

"It is appropriate for a state to insist that a petitioner seeking to overturn his conviction on the basis of new evidence demonstrate the probability that, had such 'new' evidence been received at trial, the verdict would have been more favorable to the petitioner." *Kent v. Smith*, No. 9:05-CV-0785 (LEK/DRH), 2007 WL 2907350, at *16 (N.D.N.Y. Oct. 4, 2007) (quoting *Young v. McGinnis*, No. 98 CV 281, 2006 WL 463507, at *34 (E.D.N.Y. Feb. 24, 2006) (citing to CPL § 440.10(1)(g)). Petitioner failed to satisfy that requirement.

Here, Petitioner has not explicitly alleged any independent constitutional error or that his continued incarceration would deprive him of any specific federal constitutional right. Instead, Petitioner insists that the "newly discovered evidence"—Vanier SWA, the wiretap transcripts, and the claimed cooperation agreements—would have produced a different verdict at trial. However, as noted, Petitioner's claim that his conviction is factually incorrect, or simply that he is actually innocent, does not provide a basis for habeas relief. *Herrera*, 506 U.S. at 403. Moreover, for the reasons discussed above, habeas relief is not warranted with respect to grounds six, seven, and eight of the petition.

In light of the foregoing, habeas relief is not warranted on this claim. Therefore, the Court recommends denying and dismissing ground nine of the petition.

### J.    Ground Ten: Ineffective Assistance of Counsel

Petitioner claims he was "deprived of his Federal and State Constitutional rights to the effective assistance of counsel in his defense." (Dkt. No. 35 at 38-39.) Respondent counters the 440 court's conclusion that Petitioner received the effective assistance of counsel was not

contrary to, or an unreasonable application of, clearly established Supreme Court law.  (Dkt. No. 62 at 74-77.)  The Court agrees with Respondent.

To demonstrate constitutionally ineffective assistance of counsel, a petitioner must show that counsel's performance fell below an objective standard of professional reasonableness, and but for counsel's alleged errors, the result of the proceedings would have been different.  *Premo v. Moore*, 562 U.S. 115, 121-22 (2011); *accord Strickland v. Washington*, 466 U.S. 668, 694 (1984).  "*Strickland* does not guarantee perfect representation, only a reasonably competent attorney."  *Richter*, 562 U.S. at 110 (quoting *Strickland*, 466 U.S. at 687) (quotation marks omitted).

*Strickland* instructs a court to "indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *Strickland*, 466 U.S. at 689 (quoting *Michael v. Louisiana*, 350 U.S. 91, 100-01 (1955)).  The Supreme Court recognized in *Strickland* that "there are countless ways to provide effective assistance in any given case," and that even the "best criminal defense attorneys would not defend a particular client the same way."  *Id*.  Thus, "strategic choices made after a thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  *Id*. at 690.

Further, the AEDPA requires a federal habeas court to give deference to a state court's ruling on claims of ineffective assistance of counsel.  *See Richter*, 562 U.S. at 101 ("A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.").  Thus, when ineffective assistance claims are considered under the AEDPA, the reviewing court affords a "doubly" deferential standard regarding the

state court opinion. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). In other words, when §
2254(d) applies, "[t]he pivotal question" for the federal habeas court "is whether the state court's
application of the *Strickland* standard was unreasonable." *Richter*, 562 U.S. at 101.

Petitioner claims he was "denied the effective assistance of counsel in his defense, where
(a) counsel was deprived by the prosecution of crucial *Brady* material; and (b) defense counsel
failed to utilize evidence that could have exonerated him on at least Count Two of the
indictment. (Dkt. No. 35 at 39.) In its rejection of this claim, the 440 court found Petitioner's
arguments "not supported by the record and further finds that in view of the totality of
circumstances, that [Petitioner] was not denied effective assistance of counsel." (Dkt. No. 64-1
at 588.) This Court finds the 440 court reasonably rejected Petitioner's ineffective assistance
claim.

As to his first claim of ineffective assistance, the Court agrees with Respondent that
Petitioner fails to state a claim that counsel was ineffective within the meaning of *Strickland*.
(Dkt. No. 62 at 75-76.) Rather, Petitioner appears to be restating the *Brady* claim addressed in
ground six, above. This aspect of Petitioner's ineffective assistance is nonsensical and
meritless.[23]

As to his second claim of ineffective assistance, Petitioner argues defense counsel had in
his "possession evidence that could have been used to prove [Petitioner's] innocence on count
two of the indictment and failed to use it[,]" including Petitioner's financial records, cell phone
records, flight records, and a witness statement that Petitioner was in Dutchess County on
December 19, 2011. (Dkt. No. 35 at 39; Dkt. No. 69 at 34-37.) Here, Petitioner cannot make the

---

[23] In his traverse, Petitioner seems to recognize as much: "Admittedly, trial counsel was
hamstrung by the prosecution's suppression of evidence." (Dkt. No. 69 at 34.) *See also* Dkt.
No. 35 at 22 ("Defense counsel made numerous request for "*Brady* material.").

required showing that no legitimate strategic or other reasons existed for defense counsel's decision not to "use it." "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (holding that there is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect").

On the contrary, Petitioner acknowledges "it could be assumed that this was a strategic move on defense counsel's part, especially since [Petitioner] did return home after picking up his daughter from Watervliet, New York, [at approximately 8:30 p.m. on December 19, 2011,] before boarding a flight to Florida" from Albany, New York, the next morning. (Dkt. No. 35 at 39.) Indeed, it is quite possible that this information would have hurt Petitioner's case if financial records, flight records, and cell phone records placed Petitioner in Watervliet at approximately 8:30 p.m., within an hour and half drive from Vanier's Oneonta home, especially in light of Vanier's testimony that Petitioner dropped the oxycodone off a "[c]ouple hours" before the 5:00 a.m. search on December 20, 2011. (Dkt. No. 64-7 at 131.) It is well-settled that "[a]ctions or omission by counsel that might be considered sound trial strategy do not constitute ineffective assistance." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (internal quotation marks and citation omitted).

As to Petitioner's contention that counsel failed to notice that, according to a NYSP event report, the police were stationed outside of Vanier's residence starting at 3:00 p.m. on December 19, 2011, and did not see him, the Court agrees with Respondent that such claim lacks merit. (Dkt. No. 62 at 76.) While Petitioner argues "there is no strategic reason for trial counsel's failure to question investigators about their presence outside Vanier's residence on December 19, 2011[,]" (Dkt. No. 69 at 35), Petitioner has not rebutted "'the strong presumption' that counsel's

attention to certain issues to the exclusion of others reflect[ed] trial tactics rather than 'sheer negligence.'" *Richter*, 562 U.S. at 109 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)). Because the record does not suggest that defense counsel's performance was deficient, the 440 court reasonably concluded that counsel was not ineffective. *See Minigan v. Donnelly*, No. 01-CV-0026A, 2007 WL 542137, at *22-23 (W.D.N.Y. Feb. 16, 2007) (citing *People v. Benevento*, 674 N.Y.S.2d 629, 632 (1998) (a reviewing court "must avoid confusing true ineffectiveness with mere losing tactics . . . a simple disagreement with strategies, tactics or the scope of possible cross-examination, weighed long after trial, does not suffice"); *Jenkins v. Unger*, 03 cv 1172, 2007 WL 911889, at *6 (N.D.N.Y. Mar. 22, 2007) (discussing reluctance to second-guess counsel's trial strategy simply because that strategy was unsuccessful).

Therefore, applying the "doubly deferential standard of review that gives both the state court and the defense attorney the benefit of the doubt," *Cullen*, 131 S. Ct. 1403, the Court finds that the 440 court's denial of Petitioner's ineffective assistance of counsel claim was neither contrary to or an unreasonable application of *Strickland*, nor was it based on an unreasonable determination of the facts in light of the evidence presented.

Accordingly, the Court recommends denying and dismissing ground ten of the petition.

## K.     Grounds Eleven and Twelve: 440 Court's Denial of Motions

Petitioner next claims the 440 court's denial of his 440.10 motion "without a hearing was contrary to, and involved an unreasonable application of clearly establish[ed] federal law, and was based on an unreasonable determination of the facts presented" (ground eleven), and "erroneously failed to address Petitioner's *Brady* claims in Petitioner's motion to renew the 440.10 motion, basing its decision entirely on a *Rosario* analysis[,] (ground twelve).  (Dkt. No. 34 at 41-45.)  However, these claims are "not a cognizable, free-standing habeas claim."

*Nowakowski v. New York*, No. 13 CV 3709 (RJD), 2018 WL 6421056, at *12 (E.D.N.Y. Dec. 6, 2018).

"As the Supreme Court has recognized, the Constitution does not compel states to provide post-conviction proceedings for relief." *Word v. Lord*, 648 F.3d 129, 131 (2d Cir. 2011); *see Lackawanna Cty. Dist. Attorney v. Coss*, 532 U.S. 394, 402 (2001) ("[E]ach State has created mechanisms for both direct appeal and state postconviction review, even though there is no constitutional mandate that they do so." (citation omitted)).  Accordingly, "alleged errors in a postconviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a post-conviction mechanism for seeking relief." *Word v. Lord*, 648 F.3d at 132.  "It follows that a denial of leave to appeal the denial of a CPL § 440 motion [or as in this case, denial of a motion to renew] also fails to present a basis for federal relief." *Toxey v. New York State Div. of Parole*, No. 14-CV-0610, 2017 WL 10398212, at *20 (S.D.N.Y. Nov. 8, 2017) (citation omitted), *report and recommendation adopted*, 2018 WL 4906251 (S.D.N.Y. Oct. 9, 2018).

Thus, to the extent Petitioner is also challenging any procedural errors, including his claim that the 440 court denied the motion without holding a hearing, those claims are also not cognizable on habeas review.  *Ferrer v. Superintendent*, No. 05-CV-1010, 2008 WL 2967633, at *11 (N.D.N.Y. Jul. 25, 2008) ("[f]ederal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings.") (internal quotation omitted); *Jones v. Duncan*, 162 F. Supp. 2d 204, 217 (S.D.N.Y. Apr. 3, 2001) (stating that "habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings", and denying habeas relief on the claim that the trial court failed to hold an evidentiary hearing on post-conviction motions); *see also Green v. Haggett*, No. 13-CV-0016 (GLS), 2014 WL 3778587, at

*8 (N.D.N.Y. July 31, 2014) ("Petitioner's claim is that there was a procedural defect in the conduct of a state post-conviction proceeding, because the trial court failed to hold a hearing, and federal habeas relief is not available for such alleged defects.").

Additionally, the separate claims raised in Petitioner's 440.10 motion have already been addressed in grounds six, seven, eight, and nine, and for reasons discussed herein, habeas relief is not warranted. Further, as Respondent points out, the new evidence Petitioner submitted to the 440 court with his renewal motion merely showed that the NYSP had custody of the Vollkommer and Burns recordings and of the wiretaps. (Dkt. No. 62 at 78-79; Dkt. No. 64-1 at 590.) But this additional information had no impact on the 440 court's original decision. (Dkt. No. 64-1 at 590.) Although Petitioner argued that the documents showed that the evidence was available to the district attorney at the time of the trial because the NYSP had possession of it, the 440 court had rejected this conclusion because the district attorney was not involved in the NYSP investigation of Vanier. *Id.* at 587 ("It is undisputed that the Otsego County District Attorney's Office was not involved in the investigation of Clarence Vanier, who was ultimately prosecuted by federal prosecutors, nor did the Otsego County District Attorney submit the Search Warrant Application.").

In sum, Petitioner is not entitled to federal relief because "a state is not obliged to provide any appeal at all for criminal defendants." *Ross v. Moffitt*, 417 U.S. 600, 606 (1974).

Accordingly, the Court recommends denying and dismissing grounds eleven and twelve of the petition.

### L.    Ground Thirteen: Cumulative Errors

Petitioner's final claim is that the cumulative effect of all the foregoing errors and constitutional violations he alleges in grounds one through twelve of his petition deprived him of

his constitutional right to due process.  (Dkt. No. 35 at 43-45; Dkt. No. 69 at 39.)  Respondent argues this claim is unexhausted and procedurally defaulted because Petitioner did raise a cumulative error claim in state court until he filed his leave application to appeal the 440.10 motion denial, and then raised it only as to his § 440.10 claims, and in any event, is meritless. (Dkt. No. 62 at 79.)  *See Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

A claim raised for the first time in an application for discretionary review has not been properly exhausted.  *St. Helens v. Senkowski*, 374 F.3d 181, 183 (2d Cir. 2004) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).  Therefore, Plaintiff has failed to properly exhaust his cumulative errors claim.  Petitioner's claim is also procedurally barred under adequate and independent state grounds.  Petitioner has already had his one and only direct appeal permitted under New York law.  Petitioner has also utilized his remedy under CPL § 440.10 and would be barred from raising the issue again in a § 440.10 motion by § 440.10[3](c) (barring review of a claim that could have been presented on prior motion under § 440.10).  Since Petitioner no longer has any remedy available, ground thirteen is deemed exhausted and procedurally barred.

Petitioner can overcome this procedural bar only if he demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrates that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Gueits v. Kilpatrick*, 612 F.3d 118, 127 (2d Cir. 2010) (outlining the standards for overcoming procedural default).  Petitioner has not alleged any facts to show cause for the default, actual prejudice or a fundamental miscarriage of justice. Therefore, Petitioner's cumulative error claim is procedurally barred and beyond the scope of federal habeas review.

In any event, the Court finds the claim meritless. In limited circumstances, habeas relief may be justified based on the cumulative effect of errors that, standing alone, would not warrant the granting of a new trial. *See United States v. Lumpkin*, 192 F.3d 280, 290 (2d Cir.1999). However, "implicit in such a claim is, first, that the alleged individual errors a petitioner seeks to aggregate are actually *errors*." *Joyner v. Miller*, No. 01 Civ. 2157, 2002 WL 1023141, at * 13 (S.D.N.Y. Jan. 7, 2002) (emphasis in original) (citing *Lumpkin*, 192 F.3d at 290); *see also United States v. Hurtado*, 47 F.3d 577, 586 (2d Cir. 1995) (rejecting claim that the collective impact of alleged errors warranted a new trial where the trial court committed only one error which was not itself sufficient to warrant a new trial); *Collins v. Scully*, 878 F. Supp. 452, 460 (E.D.N.Y.1995) ("only *errors* committed by the trial court may be considered in such an analysis") (emphasis in original) (citation omitted); *Sanders v. Sullivan*, 701 F. Supp. 1008, 1013 (S.D.N.Y.1988) ("[t]he cumulative-error rule . . . can only come into play after errors have been discovered"); *see also Hunt v. Superintendent*, No. 9:09-CV-934 (NAM/ATB), 2010 WL 5149279, at *28 (N.D.N.Y. Nov. 17, 2010) ("The court must first find errors, and if no single error justifies a reversal, all the errors must be assessed for their prejudicial effect." (citations omitted), *report and recommendation adopted*, 2010 WL 5147319 (N.D.N.Y. Dec. 13, 2010).

In addition, "in order for the habeas petitioner to be successful on such a claim, the errors must be 'so prejudicial that they rendered petitioner's trial [ ] fundamentally unfair.'" *Joyner*, 2002 WL 1023141, at *13 (quoting *Collins v. Scully*, 878 F. Supp. 452, 460 (E.D.N.Y. 1995)). "Fundamental fairness" has been defined very narrowly. *Id*. (citing *Dowling v. United States*, 493 U.S. 342, 352 (1990)). It is not sufficient to simply aggregate rulings that might have been unfavorable to the petitioner. *Id*. (citations omitted).

In this case, the Court has not found that any of the alleged errors were actually errors at all.  Nor has Petitioner established that the alleged errors prejudiced his case to the point that his trial was rendered "fundamentally unfair."  *See Collins*, 878 F. Supp. at 460-61 (rejecting cumulative error claim where some alleged errors were not errors, others were not cognizable on habeas review and petitioner "failed to establish inherent or actual prejudice resulting from any of the alleged errors"); *Styles v. Zandt*, No. 94 Civ. 1863, 1995 WL 326445, at *11 (S.D.N.Y. May 31, 1995) (dismissing claim of cumulative error where "[m]any of petitioner's alleged errors were not errors at all, and consideration of the record as a whole demonstrates that petitioner received a fundamentally fair trial"), *aff'd*, 101 F.3d 684 (2d Cir. 1996).

For these reasons, the Court recommends denying and dismissing ground thirteen of the petition.

## V.        CERTIFICATE OF APPEALABILITY

28 U.S.C. § 2253(c)(1) provides that "[u]nless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court[.]"  28 U.S.C. § 2553(c)(1).  A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2553(c)(2).

Since Petitioner has failed to make such a showing with regard to any of his claims, the Court recommends declining to issue a Certificate of Appealability in this matter.  *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998) (quotation omitted).

## VI.    CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that the petition for a writ of habeas corpus (Dkt. No. 35) be **DENIED** and **DISMISSED**; and it is further

**RECOMMENDED** that no certificate of appealability should be issued with respect to any of Petitioner's claims; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Report-Recommendation and Order on Petitioner, along with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report.[24]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.</u>**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of HHS*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.


Dated:  September 3, 2021
         Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[24]  If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen (17) days from the date the Report-Recommendation and Order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).